# Falls *v.* United States Savings, Loan & Building Co.

### Bill to Foreclose Mortgage.

| 97 | 417 |
|-----|------|
| 119 | 230 |
| 97 | 417 |
| 120 | 165 |
| 120 | 171 |
| 120 | 177 |
| 121 | 483 |
| 97 | 417 |
| 127 | 372 |
| f127 | 545 |

1. *Foreign statutes—when self-proving.*—If the printed statutes of another State or Territory purport on their face to be published by the authority of such government, they are admissible in evidence without further proof, although such publication may appear to have been done by a private person under the authority of the law-making power of such government.

2. *Foreign corporations—compliance with State laws.*—A foreign corporation having filed in the office of the Secretary of State, a declaration properly executed and acknowledged, designating a person therein named, together with the place of his residence, as an agent on whom process against it in favor of any citizen of Alabama may be served, and declaring that it is about to engage in business in this State, has properly complied with the laws in that regard, so that it may do business in this State.

3. *Estoppel from denying corporate capacity.*—A note and the mortgage securing the same being made payable to a corporation, as shown by various recitals in the latter, the mortgagor is estopped in a suit to foreclose the mortgage from denying the corporate capacity of the mortgagee and it is immaterial that the certificate to the charter offered in evidence is defective.

4. *Comity of nations does not extend to violation of the laws of the forum.* The laws of a foreign State authorizing a corporation created in such State to charge a greater rate of interest than eight per cent. per annum, have no binding force in Alabama, and when such corporation performs corporate acts in this State, and attempts to enforce rights growing out of such acts in the tribunals of this State, it can claim no right involving a breach of our laws, and therefore cannot enforce a contract made in Alabama, usurious under its laws.

5. *Contracts—lex loci governs.*—Though the mortgage given to secure the loan stipulates that it is made under and with reference to the laws of the State whose laws permit money to be loaned by a corporation at a higher rate of interest than eight per cent per annum, if such corporation effects a loan to a citizen of Alabama through a soliciting agent in Alabama, the application for the loan, the subscription to the stock, the assessment of the value and the examinations of the title of the property mortgaged to secure the loan, and the note and mortgage were all done and executed in Alabama—the application of the loan forwarded to the office of the corporation before it was acted on, and the money sent to a Bank in Alabama, to be paid to the borrower, constitute an Alabama contract which is governed by the laws of this State—Stone, C J., *dissenting*—save and except the subscription to the stock of the corporation as to membership fees, which must be governed by the laws of the domicile of the corporation.

6. *Contract of wife.*—A note and mortgage executed by the wife with the husband's assent for money borrowed and actually used by the wife to redeem land in which she had a statutory right of redemption, is a valid contract of the wife.

27-97

APPEAL from City Court of Birmingham.

Tried before Hon. W. W. WILKERSON.

Appellee filed a bill to foreclose a mortgage executed by Mattie D. Falls, a married woman, which mortgage was executed to secure a note of which the following is a copy:

"$10,000.                St. Paul, Minn., May 10th, 1890.

"For value received, after three years from date, and before nine years from date, we promise to pay to the order of the United States Savings, Loan & Building Company, at the office of its Treasurer, St. Paul, or to its Trustee in Minneapolis, Minn., the sum of Ten Thousand Dollars, with interest at the rate of six per cent. per annum on the sum of Ten Thousand Dollars, payable monthly. It is understood that this note is given for a loan obtained on 200 shares of stock of said United States Savings, Loan & Building Company, and if the maker hereof fails to make any monthly payment on said stock, or to pay any installment of interest for a period of three months after the same is due, then the whole amount of this note shall become due and payable, but if the maker hereof shall pay all installments of interest which become due hereon, and all monthly payments and fines which become due on said stock until said monthly payments shall have been past due for a period of six months, then upon the surrender of said stock to said Company, this note shall be deemed to be fully paid and cancelled. This note is understood to be made with reference to, and under the laws of the State of Minnesota.

Signed—                          Mattie D. Falls.
                                 Harry J. Falls."

The mortgage contained a provision in identically the same words as the last clause in the note, and provided that the mortgage might be foreclosed unless the interest on the sum of Ten Thousand Dollars was paid monthly and all fines and assessments on the stock, and also provided for Two Hundred Dollars Attorneys' fees for foreclosure of the mortgage. The charter and by-laws of the company were made exhibits to the bill. A joint answer was filed by Mattie D. Falls and her husband denying that complainant was a body corporate, and denied that it could lawfully do business in Alabama, because it had not complied with the laws of Alabama in having an agent and a known place of business therein. The answer also set up that the debt was contracted by the husband, and the wife merely became surety for the husband; that the defendants resided in Alabama and the property mortgaged was located here, and the entire transaction was negotiated, conducted and concluded in Alabama, and the

effort made by the bill to locate the transaction in Minnesota was, and was intended as a device to cover the usury in the transaction, and sets up usury as a defense.    Mattie D. Falls afterwards filed a separate answer and cross-bill setting up the same defenses and praying that the mortgage be cancelled as a cloud on her title.

The testimony showed that the application for the loan, the application for stock, the transfer of the stock, the execution of the note and mortgage, the assessment of the value of the property, and examination of the title, were all made in Birmingham, Alabama, that the money was placed by the complainant in the Alabama National Bank, which paid eight thousand, five hundred and seventy dollars and forty-six cents of the loan to one W. H. Letchford, and retained five hundred and ten dollars for monthly dues and interest, one hundred, sixty-two dollars and fifty cents for membership fees, twenty-five dollars for exchange, and the balance of the ten thousand dollar loan was paid to the husband of Mattie D. Falls.    Complainant had an agent in Birmingham who drew up the application for the loan.

The land conveyed by the mortgage had been purchased by the husband of Mattie D. Falls from one Reed, and a mortgage securing the purchase-money was made to Reed who transferred the debt to one Letchford; the husband of Mrs. Falls conveyed the land to her and afterwards Letchford foreclosed the mortgage by a Chancery suit to which both husband and wife were parties, and at the sale made under the Chancery decree, became the purchaser.    The money obtained by the loan was used in part to redeem the land from Letchford who executed a deed to Mrs. Falls.

R. H. PEARSON, and JOHN VARY, for appellant, made the following points:   That a foreign corporation cannot violate the law of another State against usury, Morawetz, § 505; *Hitchcock v. U. S. Bank*, 7 Ala. 435; *Nelms v. Edinburgh Mort. Co.*, 92 Ala. 157; *Martin v. Johnson*, 8 L. R. A. 170; *Am. Mort. Co. v. Sewell*, 92 Ala. 163; *Dolman v. Cook*, 14 N. J. Eq. 56; *Ib.* 229; *Ib.* 355.   That the transaction in this case was usurious, *Loan As. v. Heider*, 55 Iowa, 424; 5 N. W. Rep. 578; 7 *Ib.* 686; 24 Conn. 147; *Miller v. Balt. As.*, 45 Md. 546; *Forest As. v. Gallagher*, 25 Ohio St. 208; *Hawkeye As. v. Blackburn*, 48 Iowa, 385; *Monticello As. v. Smythe*, 9 Rep. (Ill.) 714.

J. M. McMASTER, for appellee, filed a printed brief and on application for rehearing he, with F. H. EWING, filed another

lengthy brief, citing authorities on the following points: That corporate power cannot be denied by one who deals with it as such: 3 Brick. Dig. p. 161, § 86; *Savage v. Russell*, 3 Stew. 235; *Cahall v. Ass'n.*, 61 Ala. 232; *Lehman v. Warner*, 61 Ala. 455; that the law of the place of the performance of a contract governs: *Hitchcock v. Bank*, 7 Ala. 435; *Hanover case*, 40 Ohio St. 274; *Hunt v. Hall*, 37 Ala. 702; *Hanrick v. Andrews*, 9 Porter, 9; *Cubbedge v. Napier*, 62 Ala. 522, and many other cases, some of which are cited in the opinion. That a contract referring to the law of the place of performance must be governed by such law: 3 Am. & Eng. Encyc. 514; *Vermont L. Co. v. Whitehead*, 35 Am. & Eng. Corp. Cases; that the contract is not opposed to public policy or morals, *B. & L. Co. v. Lake*, 69 Ala. 456; *M. & M. Co. v. Robinson*, 69 Ala. 42; *Thompson v. Gillison*, 6 S. E. Rep. 333, (So. Ca.);, *Reese v. B. & L. Co.*, 19 S. W. Rep. 917: *Nat'l. B. & L. v. Abbott*, 20 S. W. Rep. 118. The briefs are quite lenthy and it is impracticable to give more than a synopsis.

STONE, C. J.—In Code of 1886, § 2790, is this language: "The proceedings of any legislative body purporting on the face of the book to be printed by authority of the government, State or Territory, are evidence without further proof." A book published in St. Paul, Minnesota, in 1879, was offered in evidence to prove the statute law of that State. It was objected to. The title page of the book has these words: "The general statutes of the State of Minnesota,  ·   ·   ·· prepared by George B. Young." Immediately succeeding the foregoing statement is found the following: "Edited and published under the authority of chapter 67 of the laws of 1878 and chapter 67 of the laws of 1879." These statutes are printed in full on the second leaf of the book. Chapter 67 of the statutes of 1878 declares that "The said statutes shall be compiled and published by a commission consisting of George B. Young and such others as he may associate with him, under the supervision and direction of the Governor." Chapter 67 of the statutes of 1879 provides that "The edition of the general statutes and other public laws of this State in force at the close of the legislative session of eighteen hundred and seventy-eight (1878), prepared by George B. Young, pursuant to chapter sixty-seven (67) of the general laws of eighteen hundred and seventy-eight (1878), shall be competent evidence of the several acts and resolutions therein contained, in all courts of this State, without further proof or authentication." It is difficult to conceive of language which would more clearly express the fact that

the laws found in said book were printed by authority of the State, than is here shown. Our statute does not require that the State shall be the publisher. That it is done with its authority is enough.— *Clanton v. Barnes,* 50 Ala. 260; *Bradley v. Northern Bank of Alabama,* 60 Ala. 252. There is nothing in this exception.

There is, if possible, less merit in the objection to the introduction in evidence of the Minnesota compilation of statutes published in 1891, so far as those statutes can be considered in this case. See the certificates in the first of the volume, made by the Secretary of State and State Librarian, and see section 261 of the book itself.

The real transaction in this case was a loan of money by a Minnesota corporation, The United States Savings, Loan & Building Company—to Mrs. Falls. And the negotiation and agreed contract were conducted and consummated in Alabama. The corporation had a place of business in Birmingham, Alabama, and had an agent thereat. It had complied with our constitutional and statutory provisions.—Con. Art. XIV., Sec. 4; Sess. Acts, 1886–7, 102. This compliance gave it a constitutional and legal right to transact business in Alabama.

An objection was reserved to the action of the City Court in receiving in evidence what purports to be a certified copy of the act and proceedings by which appellee was incorporated. The precise objection is, that the authentication is not a compliance with legal requirements. We hold it to be unnecessary to decide this question. That the appellant executed the note and mortgage, the collection of which by foreclosure is the purpose of this suit, is fully shown, and no where denied. We hold that the mortgage shows on its face that the United States Savings, Loan & Building Company is a corporation. This is shown in very many of its recitals, and this dispensed with all proof of its incorporation. So, whether the transcript was properly authenticated or not was immaterial. Mrs. Falls had admitted complainant's corporate character by the execution of the mortgage. 1 Mor. Corp., § 39; 2 *Ib.* 592, 774.

Each separate government or State has its own legislative system and policy; and, in determining and enforcing rights which originate out of our jurisdiction, comity requires that we shall admeasure the redress by the yard-stick of the place where the right accrued. In entering into contracts, if nothing appear to the contrary, the law of the place silently becomes a part of the contract, and determines the measure of right it secures. This right by comity, however,

has limitations. No State will enforce contracts or redress grievances entered into, or suffered in another State or foreign country, if the enforcement involve a breach of legal or moral right as maintained in the law of the forum.

When a corporation of foreign creation not only attempts to enforce rights before our tribunals, but goes farther and actually performs corporate acts within our jurisdiction, it can claim and exercise no exceptional rights or privileges which may have been conferred by the law of its creation, if such enforcement involves a breach of our own public policy, or statutory system. The legislature of one State can not confer rights, and authorize their exercise beyond its own boundaries, unless they be in harmony with the general policy of the State or country in which the exercise is attempted. "The power of a corporation to act in a foreign country depends both upon the law of the country where it was created, and on the law of the country where it assumes to act. It has only such powers as were given to it by the authority which created it. It can not do any act by virtue of those powers in any country where the laws forbid it so to act. It follows that every country may impose conditions and restrictions upon foreign corporations which transact business within its limits."—Sto. Confl. of Laws (8th Ed.), § 106, note a. In 2 Mor. Corp., § 959, is this language: "It is a fundamental principle that the laws of a State can have no binding force, *proprio vigore,* outside of the territorial limits and jurisdiction of the State enacting them." And in section 964 the same author says: "It has been held that, although a corporation be expressly authorized by its charter to charge a certain rate of interest upon its loans, it will nevertheless not be permitted to charge the same rate in a foreign State, if that would be contrary to the usury laws there in force." And in section 965 this author says: "Foreign corporations have no right by the law of comity to do acts within a State which are prohibited by the laws of that State to its own citizens or corporations engaged in a similar business."

It is not our intention to determine in this case whether a building and loan association, incorporated and doing business in Alabama, can contract for and recover a greater rate of interest than 8 per cent. per annum. See our statutory system, commencing with section 1553 of the Code of 1886. What we do decide is, that the statutes of Minnesota have no binding force with us; and any provision found in them which authorized a corporation of their creation to contract for and recover more than 8 per cent. for the loan

[Falls v. United States Savings, Loan & Building Co.]

or forbearance of money, is obnoxious to our statute enacted
for the prevention of usury.  We hold further that the con-
tract which gave rise to the present suit is an Alabama
contract, and can only be enforced to the extent our statutes
permit.  Any statute of this State which may be supposed
to confer on building and loan associations the right to
charge more than eight per cent. interest, even if we concede
such statutory authority, must be confined in its operation
to such corporations as are chartered in Alabama.  It can
not be supposed that our legislation had a greater purpose
or intent than this.

We have made no accurate calculation, and hence can not
declare the precise rate of interest Mrs. Falls would be
required to pay, if she were to comply with the letter of her
contract.  It is greatly in excess of 8 per cent. per annum.
The plea of usury is very fully sustained.  With us, how-
ever, usury is only a partial defense.  It extends only to a
denial of all interest, when the party contracting to receive
usury is the complainant.  The rule in chancery is different
from that which prevails at common law.—*Dawson v. Wil-
liams*, 73 Ala. 111; *Uhlfelder v. Carter*, 64 Ala. 527.

Several other defenses were urged in this case which we
consider untenable.  This was in no sense a loan of money
to the husband.  The loan was to Mrs. Falls, and we think
there is nothing in any of the objections urged, save the
single one of usury.  That, with us, is only a partial de-
fense.

A single feature of the controversy before us, we think,
must be governed by the laws of Minnesota.  The United
States Savings, Loan & Building Company was incorporated
under the laws of Minnesota, and has its business domicil in
that State.  The first step taken by Mrs. Falls was to con-
stitute herself a stockholder in that corporation.  This act
must be considered as having been performed in Minnesota,
and as governed by the laws of that State.  Under their
system corporations in forming are permitted to charge a
graduated membership fee.  In the case before us it
amounted to $155.  We hold that this fee, together with the
agreed attorney's charge of $200 for foreclosing the mort-
gage is collectible.  The latter—the attorney's fee of $200—
is expressly provided for in the mortgage.  No question is
raised upon its reasonableness, and we feel no hesitancy in
holding that this item was properly allowed to complainant.

Mrs. Falls did not receive the full $10,000, the amount of
the agreed loan.  Three monthly installments were retained,
amounting to $510.  Also the membership fee, $155, was

withheld. The latter rightfully as we think, and she is entitled to no credit for that. What she actually owes is $9,490, plus $200, attorney's fee for foreclosing the mortgage.

The decree of the Chancellor is reversed, and a decree here rendered that the complainant, instead of the sum of $12,638, recovered in the court below, have and recover of appellant $9,490, and other $200 attorney's fee, with a lien and to be enforced as directed in the decree of the chancellor. Let the costs of appeal be paid by the appellee.

Reversed and rendered.

STONE, C. J.—Since the opinion in this case was delivered November 25, 1892, an elaborate and earnest argument has been submitted by appellee, asking a reconsideration of that decision. One position assumed and pressed with great zeal is, that the contract under consideration is not tainted with usury, even assuming it to be governed by the statutes of Alabama. The precise argument used in this connection is, that the payments stipulated to be made monthly by Mrs. Falls, other than those which are, in the very terms of the by-laws and contract called interest, are not payments on the debt contracted, but calls or instalments paid on the shares of stock subscribed for. If this position be sound, the interest actually collected is only one half of one per cent. per month, equal to six per cent. per annum, and hence not usurious.

The corporate powers, by-laws and methods of doing business which pertain to the United States Savings, Loan & Building Association, are set forth in the transcript before us. We will briefly sketch what we understand to be the main features of its plan of operations, so far as it is necessary to a proper understanding of this case.

The authorized capital of the corporation was and is ten millions of dollars. It is divided into shares valued at one hundred dollars each. Unlike most money corporations, the capital stock is not required to be paid in at, or within a short time after organization, with a view of supplying a fixed security for creditors. On the contrary, the shares are paid for in monthly instalments, aggregating $7\frac{20}{100}$ per cent. during the year, or $6\frac{10}{100}$ of one per cent. per month. Paid at this rate, and without other resource, the entire capital stock will be paid in a fraction under fourteen years. This is the rate to non-borrowers, called investors.

The business of the corporation is lending its money, and its chief loans are made on real security, appraised and valued at double the amount of the loan. The monthly in-

stalments paid in less 10 per cent. thereof reserved to defray the expense of administering the corporation, supplemented with the monthly payments of interest constitute the operating capital of the corporation, on which it conducts its business of lending money.    These loans are made monthly, and consequently the funds are kept employed and interest-bearing.

What are denominated share-holders, are divided into two classes ; those who borrow from the corporation, and those who do not.    To obtain a loan from the corporation, the applicant must first become a shareholder, paying for the privilege a small, graduated membership fee, of one and a half dollars per share, down to seventy-five cents.    After paying three monthly instalments, he may apply for and obtain a loan on the following terms and conditions :

1.    The applicant must first obtain the requisite shares of stock ; and for this service, he must subscribe for double the number of shares, which would be requisite to make up the sum proposed to be borrowed, rating shares at their full matured value of one hundred dollars each.    So, in borrowing $10,000—the sum borrowed in this case—the borrower must subscribe for 200 shares.    That was done in this case.

2.    The applicant must also have paid three monthly instalments of sixty cents. per share, and three months interest on the sum proposed to be borrowed, at 6 per cent. interest.    These sums which were required to be prepaid in this case amount to $510 ; being for instalments $360, and for interest $150.    So, the borrower actually obtained only $9,490.

3.    The borrower, before obtaining the loan, was required, and did bid one hundred of his subscribed shares, to be surrendered to the company as a bonus for the privilege and personal favor of being allowed to become a borrower ; but monthly instalments exacted from shareholders of sixty cents per month were still required to be paid by the borrower on the entire number of subscribed shares, including the one hundred, surrendered as a bonus.    So, the borrower is required to pay and did bind herself to pay in this case, double the sum of the instalments required of non-borrowers—equal to one-seventh of the sum borrowed.    These payments, unaided, if credited without discount or diminution, would mature the stock and extinguish the debt in seven years.

4.    The borrower was required to mortgage, and did mortgage real estate appraised at $20,000, to secure the payment of the monthly instalments and interest until the sum bor-

rowed should be repaid, after deducting from all instalments paid a sum to cover the corporating expenses.

5. In addition to this mortgage security, the borrower was also required to pledge, and did pledge for the repayment of the money borrowed her remaining 100 shares of stock which had been made the basis of the loan.

6. Notwithstanding the instalments required to be paid monthly, which in the course of the year amounted, in addition to interest paid during the year, to a fraction over fourteen per cent. of the principal of the money borrowed—the sum of the year's instalments paid on the principal of the debt being one-seventh thereof—this did not diminish the sum of the interest required to be paid each year, so long as any portion of the money borrowed remained unpaid. Thus: The sum borrowed in this case was ten thousand dollars. The agreed interest on this was six per cent, equal to $600 for the first year. But the payment of this sames um of $600 interest was to be kept up so long as any of the principal debt remained unpaid. Even when the principal of the debt became reduced by instalments paid to one-seventh of the original sum borrowed, the rules of the company and the contract in this case required the borrower to pay the same agreed amount of interest—$600—for the forbearance of the remaining one-seventh of the debt for one year.

The borrowers must first become shareholders. In what sense do they become such? They acquire none of the privileges or rights of shareholders, in the ordinary sense of that term. They receive no dividends, and have no share in the profits of the enterprise. When they repay the money borrowed, according to the terms of the loan, they receive no certificate of stock, and when the business of the corporation is wound up, they have neither part nor lot in its profits or accumulations. On the contrary, when the principal debt is extinguished by the payment of the monthly instalments demanded, and the fixed, unchanging sum of agreed, so-called interest, is paid up to, and including the time when the instalments extinguish the principal debt, then their connection with, and interest in the enterprise ceases. Not by the receipt, or retention of a certificate of stock. Not by any participation, or right to participate in the profits or accumulations of the adventure. It ceases by a cancellation of the so-called certificates of stock, and a final severance of the borrower's connection with the corporation. By the very terms of the note and mortgage the borrower is required to make the agreed monthly pay-

ments of instalments and interest, "until said stock becomes fully paid in, and of the value of $100 per share, . . and shall then surrender said stock to said company in payment of said note." These are the terms the contract imposes on the borrower—these the conditions on which she can obtain a release of her lands from the mortgage lien. When these terms are complied with (and of course not till then), "this deed [the mortgage] shall be null and void, otherwise to remain in full force and effect." It is no where said that the borrower shall share in the profits or assets of the association; the very language of the note and mortgage as copied repels such interpretation.

Can it with any propriety be said, that persons, filling the relation we have been describing, ever become shareholders in the corporation? They acquire none of the rights which attach to that relation. Are they not simply borrowers of money; and is not all else simply machinery to bring about that end; useless machinery, save that it may furnish excuse for demanding of the borrower a membership fee, and that he shall contribute to the expense fund of the corporation's administration? The corporation is also empowered to impose, and does impose, penalties and forfeitures, for delays and defaults in the payment of instalments and interest. Such imposed penalties are found in the transcript before us.

Being practically a loan of money, was the loan in the present case an agreement to demand and pay a greater rate of interest than 8 per cent. per annum—the lawful interest of the State of Alabama? We employ the word agreement, intentionally; for, to be usurious, the contract itself must stipulate for interest above the lawful rate.

We have been referred to two calculations, with the view of convincing us that the interest stipulated to be paid in this case is not usurious on its face. One of those calculations is shown in the deposition of the witness Douglas, found in the transcript before us. The other is seen in the report of the case of *Thompson v. Gillison*, 28 So. Car. Rep· 534—6 S. E. Rep. 333. In each of those instances the calculator was betrayed into the same oversight or error. Each allowed to the lender the same sum as interest for each of the years the loan was permitted to run, as if the principal, or interest-bearing fund, had remained undiminished during the whole term of the loan. Had that been the case, in other words, if the borrower had paid only the interest during the intervening years, and had left the principal intact until the final settlement, and then paid the entire prin-

cipal at one time, their calculations would stand vindicated. This, because in such case the interest-bearing fund would remain the same during the entire period of the loan. But they were not dealing with such facts. The problem they were handling was like the one we have in hand; the principal, or interest-bearing debt, was being reduced, say, one-seventh each year.

We have made many calculations, and have, in that way, demonstrated the correctness of the proposition, that by the very terms of the contract Mrs. Falls made with the U. S. Sav., L. & B. Association, she bound herself to pay interest, and to pay it monthly, at a rate greatly in excess of 6 per cent. *per annum*, and very materially in excess of 8 per cent. *per annum*. Let us state the account on the facts of the case we have in hand.

Computing the several payments of the principal debt required to be made during each year as aggregating one-seventh of the debt, the whole debt will necessarily become extinguished in seven years. In this we do not compute the sums paid as interest, but include only the excess of the several payments over and above interest. Thus, the sum of the amount of the loan being $10,000, it necessarily follows that for the first year the interest-bearing debt must be $10,000. But, the principal, or interest-bearing debt, being reduced one-seventh by payments during the first year, it follows that the sum of the debt left unpaid for the computation of interest for the second year, will be only six-sevenths of $10,000. And so the process of reduction of the interest-bearing debt will go on at the rate of one-seventh each year. For the seventh year the principal on which interest is to be computed will be only one-seventh of $10,000; a fraction over $1,428. Six per cent. interest paid at the fixed, unchanging sum of $600 *per annum* for these seven years will aggregate $4,200. Calculated on the balances left after the several yearly payments are deducted, the sum of the several payments of interest will amount to $2,400, or four-sevenths of $4,200. This shows an excess of interest stipulated to be paid during the seven years of $1,800, if we compute interest at six per cent. *per annum*. If the unchanging sum of $600, stipulated to be paid during each year—aggregating $4,200 during the seven years—be in fact paid, the borrower instead of paying six per cent. for the forbearance of the money, will in fact have paid at the average rate of $10\frac{1}{2}$ per cent. *per annum*. And this excess of interest Mrs. Falls bound herself to pay by the very terms of the contract she entered into.

[Falls v. United States Savings, Loan & Building Co.]

The contract requires Mrs. Falls to pay $170 per month, equal to $2,040 during each year. In the calculations we submit we treat these payments as if made in gross at the end of each year. Treating them thus, and computing interest only on the balances left after the annual payments, the following results are shown:

1. At 6 per cent. interest, the debt of $10,000 will be entirely extinguished, principal and interest, by these annual payments of $2,040, in a fraction less than six years; and in so paying, the entire interest paid by the borrower will amount to a fraction less than $2,200. Paid at the agreed rate of $600 for each of the six years, it would amount to $3,600.

2. At 8 per cent. interest, the same annual payment of $2,040 would extinguish the debt, principal and interest, in something less than six and a half years, while the sum of all the interest paid would be $3,178. Paid on the basis of the contract at the gross sum of $800 per year, it would amount to $5,200. We might give other examples by way of illustration, but we think these sufficient.

It will be observed that in making our calculations, we have assumed that the borrower received the full $10,000. She actually received only $9,490. And we have pretermitted all consideration of the membership fee she was required to pay, and her share of the operative expenses of the corporation, which the rules of the association hold her liable for. We have likewise taken no account of the fact that the interest was made payable monthly. These items brought into the account would materially swell the burden the contract imposes on the borrower.

If further proof be required to show the contract we are considering is usurious in its terms, it is furnished in the decree the chancellor rendered in this cause. No one contends that in rendering his decree he went beyond the letter of the contract he was construing. Yet, although the decree was rendered less than two years after the money was borrowed, the $10,000 had increased to $12,638; and of this sum only $440 was for fines assessed for non-payment of monthly installments and interest. This taken from the $12,638 leaves about $2,200 of interest and charges for the use of $10,000 from the date of the contract—May 10, 1890—to the date of the decree—March 10, 1892. This accorded to complainant about one per cent. interest per month, or 12 per cent. *per annum.*

The other class of shareholders are non-borrowers, sometimes called investors. The monthly instalments required

of these is just one-half of the sum required of the borrowers—being 1-14 of the value of their stock, and they pay no interest.   They have no shares required to be surrendered as a bonus, or premium; no dead shares.   They pay instalments only on the shares they own, and acquire all the rights of shareholders or stockholders in the corporation, to the extent of the stock they subscribe for.   They have a voice in the government of the corporation, and share in its dividends and other accumulated assets.   They share ratably in all the excess of interest paid by the borrowers, and in this way realize more than lawful interest on their investment.   Under all the calculations, the shares of the investors mature in about seven years up to the full $100 per share. These are shareholders in fact and in law, for they have all the powers and rights of shareholders in corporations.

No one will dispute that the investors realize more than lawful interest.   Whence comes the fund from which this excess of interest is realized?   It must come from the borrowers, for there is no other source from which it can be derived.   To secure to one class unlawful interest while none of the shareholders pay in excess of the lawful rate, is a physical impossibility.   The consequence is that their shares will have matured unto their full value of $100 per share, while they have paid out but little if any over half that sum, and have lain out of the use of their money for a time which averages only three and a half years, or four at most.   So, the non-borrower realizes a much higher rate of usurious interest than the borrower pays.   This, because there are many more borrowers who pay usurious interest than there are investors who divide that usury between them.

We have said this was practically a loan of money.   Stripped of all mere formal accompaniments, we are not able to discover any material connection Mrs. Falls ever had with the corporation, other than as a borrower of money.   She had no voice in its government, no share in its profits or assets.   In determining the character of any given transaction, the law regards the substance, not the form it is made to assume.   In *Uhlfelder v. Carter*, 64 Ala. 527, this court said: "In determining whether a contract is infected with usury, its substance and effect, not its form, are material.   The intent to take or reserve more than lawful interest for the loan of money, or the forbearance of a debt, must exist; and this is deduced from the relations of the parties, their acts contemporaneous with, or subsequent to the contract, and all attendant circumstances.   When this intent exists, and such

[Falls v. United States Savings, Loan & Building Co.]

is the substance and effect of the contract, no form or covering which may be given to it, no device or shift, can sustain it. A simple loan, or the mere forbearance of an existing debt, which, with the lawful interest, is not put at hazard, but is certainly to be paid, will become usurious, by engrafting upon it stipulations intended for the additional profit of the creditor, and not as compensation for loss or inconvenience he may bear."

Our calculations and argument are based, not on contingent or possible losses the association may suffer in its administration. We have considered the questions on a basis the most favorable and successful that could possibly attend the enterprise, even if every borrower meets his contracual engagements punctually, and every installment is paid on the day it matures. We have allowed to the borrower full credit for the entire sum of the installments he is required to pay, without deduction of anything therefrom to meet corporation, or other expenses or losses. And we have shown that with these most favorable, possible results—(we may say impossible)—the borrower is bound, by the very letter of the contract, to pay a rate of interest greatly in excess of 8 per cent. *per annum*. And it is of no moment that no witness testifies that the interest is usurious. The corporate powers, the by-laws and the contract are shown in the transcript, and these furnish the evidence—the indisputable evidence—that the rate of interest required and contracted to be paid is manifestly in excess of 8 per cent. The question is simply one of arithmetical calculation; and the laws of arithmetic are judicially taken notice of. And the excess is so obvious, that it is impossible to suppose it was not intended.

The excess of interest, noted above, is one of the fixed, certain terms of the contract by which the money was lent, and which Mrs. Falls, in obtaining the loan, bound herself to pay. No ingenuity can infuse any element of contingency or uncertainty into her contractual obligation to pay up to this point. Beyond this, however, there is an uncertain liability, namely: it can not, from any thing shown to us, be certainly known how much she may be required to pay beyond the sums shown in our calculations. Enough for us that the contract itself requires the borrower to pay more than lawful interest.

But there was another reason operating upon the writer of this opinion which induced him to request a recall of the certificate of reversal, and a farther consideration of the case. He had come to doubt the correctness of the conclusion an-

nounced, that in determing the question of usury, we must be governed by the Alabama statutes.

The facts shown by the record are as follows: "The United States Savings, Loan & Building Company is a private corporation, incorporated under the laws of Minnesota, located and doing business in the City of St. Paul, of that State. One of its purposes is the loan of money on long time, secured by mortgage on real estate, the accruing interest and partial installments of the principal to be paid monthly. True, they are not, in the books of the corporation, or in the contract of the parties, called installments of the debt, but monthly payments on the capital stock. We think, however, that this is a misnomer; for we can not perceive that the borrower on subscribed shares ever becomes a stockholder in fact. He acquires none of the rights or powers of a stockholder; as that term is generally understood and applied.

The negotiation for a loan was entered upon in Birmingham, Ala. That negotiation was conducted by the husband of Mrs. Falls representing her, and a soliciting agent representing the corporation. As I understand the record, the following comprises substantially what was done in Alabama: The soliciting agent furnished the information and the blanks necessary to be filled out and signed, in order to make the application in proper form to obtain membership and the loan, and probably filled those blanks, and forwarded the application. It is probable that he also represented the corporation in having the abstract of title prepared, a valuation made of the property offered as security, and the preparation of the note and mortgage, to be executed by the applicant. All these acts, however, were provisory. They were but an offer. It is not only not shown that the soliciting agent entered into any binding contract that the company would accept the offer and lend the money, but the converse of this proposition is established. Not until the proposition was considered at the home office, not until the papers were examined and the offer accepted, was any contract made which would bind the company. Not until then could Mrs. Falls have maintained an action for a breach of contract, if the company had refused to advance the money; for no contract had been concluded. Such is the unmistakable language of the record.—*Derrick v. Monette*, 73 Ala. 75; 3 Brick. Dig. 361, § 426; Wharton, Confl. of Laws, § 421. When Mrs. Falls' proposition was accepted, a check for the money was issued by the proper officer of U. S. S., L. & B. Co., in St. Paul, Minnesota, payable to the order of Mrs. Falls. That

check was drawn on the Minnesota Loan & Trust Company, the building and loan company's trustee, having its business habitation in Minneapolis, Minnesota. True, that check was cashed at a bank in Birmingham, Alabama, but there is nothing unusual in that; and it is not shown that the B. & L. Company had any agency in procuring that to be done, even if we concede such agency would affect the question. The note given by Mrs. Falls and her husband, although signed in Birmingham, Alabama, is made payable "to the order of the United States Savings, Loan and Building Company at the office of the treasurer, St. Paul, or to its trustee in Minneapolis, Minn. · · This note is understood to be made with reference to, and under the laws of the State of Minnesota." The mortgage also stipulates that the money is to be paid "at the office of (the company's) treasurer at St. Paul, Minnesota, or at the office of its trustee, Minneapolis, Minnesota; and it also contains the clause, "This mortgage is understood to be made with reference to, and under the laws of the State of Minnesota." So I repeat no binding contract was agreed on, or concluded in Alabama.

That justly celebrated jurist, Chancellor Kent,—2 Com. 459—employed this language: "If a contract be made under one government, and is to be performed under another, and the parties had in view the laws of such other country in reference to the execution of the contract, the general rule is that the contract, in respect to its construction and force, is to be governed by the law of the country or State in which it is to be executed; and the foreign law is in such cases adopted, and effect given to it."

In Story Confl. of Laws, § 280, it is said, "where the contract is, either expressly or tacitly, to be performed in any other place, there the general rule is in conformity to the presumed intention of the parties that the contract, as to its validity, nature, obligation and interpretation, is to be governed by the law of the place of performance."

In 3rd Am. & Eng. Encyc. of Law, 543–4, the principle is thus expressed: "As a general rule, the validity of a contract is to be determined by the law of the place where it is made, unless it appears on its face that it was to be performed, or was made in reference to the laws of some other place, in which case it will be governed by the laws of the place of the performance." Each of these standard works has abundant citations of authorities. See also, *Hunt v. Hall*, 37 Ala. 702; *Cubbedge v. Napier*, 62 Ala. 518; Boone on Mortgages, § 86; *Hanrick v. Andrews*, 9 Por. 9; *De Wolf v. Johnson*, 10 Wheat, 367; *Cromwell v. Co. of Sac.*, 96 U. S. 51;

*Peyton v. Heinekin,* 131 U. S. App. C. I.; *Dolman v. Cooj,* 14 N. J. Eq. 56; *Goodrich v. Williams,* 50 Ga. 425.

I am aware that artifice is sometimes resorted to in making contracts, with a view of evading the laws against usury. To this end a false, or fictitious place of performance is sometimes inserted in the writing. Whenever such attempt is made to appear, the courts refuse to lend their sanction to it. If such was the intention in this case, it has not been shown. I feel forced by the authorities to hold, that, in the matter of collectible interest under this contract, the laws of Minnesota must govern.

It is not my intention to disturb our former rulings as to the law which should govern this contract. On that question I think the present case clearly distinguishable from any we have heretofore decided, in two particulars: First, the final agreement of the parties—the closing of the bargain—was consummated in Minnesota, and the money borrowed was promised to be repaid there. Second, it is one of the express terms of the contract that it is "made with reference to, and under the laws of Minnesota." This provision, standing alone, would not be decisive, for it might be prostituted to improper uses. Taken in connection with the facts of this case, I think it supports the conclusion I have reached. I repeat, it is not my intention to overturn our former rulings.—*Farrior v. New England Mortgage Security Co.,* 88 Ala. 275; *Amer. Freehold Land Mortgage Co. v. Sewell,* 92 Ala. 163; 9 So. Rep. 143; *Evans v. Kittrell,* 33 Ala. 449.

The foregoing is only my own opinion, formed alone on what is shown in the transcript. My brothers, however, differ with me, and adhere to the first opinion. The result is, that the application for a reversal of the former ruling is denied.