# Pioneer Savings & Loan Co. *v*. Nonnemacher.

127  521
130  298
130  299
131  254
,131  255

127  521
137  122

127  521
140  376

127  521
141  626

*Bill in Equity to enjoin Foreclosure of Mortgage, and to have Mortgage cancelled.*

1. *Bill to enjoin foreclosure of mortgage and to cancel same; amendment; when not repugnant.*—Where in a bill filed against a building and loan association to enjoin the foreclosure of a mortgage and to have the mortgage concelled, the relief praye_ for is based upon averments therein showing that the mortgage debt has been fully paid, there is no repugnancy in an amendment thereof which contains alternative averments showing in detail how the mortgage indebtedness has been settled, the manner of securing the loan from defendant, his subscription for stock in the association, which it was stipulated should mature at a designated time, and then avers that complainant has paid all installments and assessments against his stock during said stipulated period, and that the value o_ h.s stock, which was held by defendant as collateral for the mortgage debt, was more than sufficient to pay off the mortgage indebtedness, and then prays for a sta_ement of account between complainant and defendant and for a decree over against the defendant for any balance that might be ascertained to be due complainant; and such bill as so amended is not subject to demurrer for inconsiste⁻⁻y and repugnancy.

[Pioneer Savings & Loan Co. v. Nonnemacher.]

.2. *Building and loan association; subscription to stock; usury.*—A subscriber for stock in a foreign building and loan association pays his membership fee, and the subscription contract stipulates that if the subscriber pays all his dues and assessments, the stock shall mature at a designated time. The day after so subscribing, he makes application to the association for a loan, which was subsequently obtained, to secure which he executes a note and a mortgage on real estate, and transfers to the association as collateral security for the mortgage debt his stock so subscribed for. The mortgage debt was made payable at the time fixed in the subscription contract for the maturity of the stock. The note and mortgage provided for the payment of 5 per cent. interest and 5 per cent. premium per annum, and were payable at the home office. The legal rate of interest in the State of the association's residence was 10 per cent. Said subscriber and shareholder participated in the profits and had an equal voice with the other shareholders in the management and control of the association. *Held*: There was a dual contractual relation of shareholder and borrower borne by said person to the association, and the respective duties and obligations as shareholder and borrower resting upon him are separate and distinct; and therefore, it can not be said that such subscription and borrowing constituted but one single transaction, which took such form as a scheme or device to avoid the usury laws.

:3. *Usurious contracts; by what laws construed.*—Where a contract is made in one State to be performed in another State, the parties may stipulate for the payment of the highest legal rate of interest allowed by either State, without offending against the usury laws of the other State; provided such stipulation is not made as a subterfuge and device for, and with the intention of, evading the usury laws.

4. *Same; same; building and loan association.*—When a resident of this State borrows money from a building and loan association, incorporated under the laws of Minnesota, with its home office in that State, where the legal rate of interest is 10 per cent. per annum, and the note and mortgage executed by the borrower stipulates for the payment, monthly, of 5 per cent. interest and 5 per cent. premium per annum, and for the payment of the mortgage debt at the home office, and the form of contract between the parties was the one regularly used by said association in the making of loans, it can not be said that said contract was usurious.

:5. *Contract; when can be altered by subsequent agreement with-*

[Pioneer Savings & Loan Co. v. Nonnemacher.]

*out valuable consideration.*—An executory contract in writing may be altered, modified or rescinded by a subsequent agreement, even in parol, without a new consideration; the mutual assent of the parties to the new agreement being the only consideration necessary to support it.

6. *Same; same; alteration of building and loan association contract.*—The contract of subscription to stock in a building and loan association, in addition to the usual. payment of monthly installments, provided for the levying and collecting of extra asessments, and expressly stipulated that the stock should mature at a ⸺efinite and fixed time. After having subscribed for stock in said association a shareholder borrowed money from it, to secure the payment of which he gave a mortgage on real estate, and also transferred his stock in the association as collateral security. . Subsequently and before the expiration of the time for the maturity of the stock and of the loan, upon condition that the association would release him from all liability for the extra assessments provided for in the original subscription contract, the shareholder and borrower agreed that the period for the maturity of his stock should be changed from a definite and fixed term to an indefinite time, and that he would continue his monthly payments thereon until the profits appropriated thereto were sufficient to pay off the mortgage debt, when the same should be applied in discharge of said debt and all liabilities between the parties cancelled. *Held*: That the said subsequent agreement by which the original contract of subscription was altered was binding between the parties; and the fact that at the time of such alteration no particular assessments had been actually levied was immaterial.

7. *Building and loan association; forfeiture of borrower's stock; when borrower entitled to credit on mortgage debt for cash surrender value of stock.*—When a statute of force in a State, wherein a foreign building and loan association is incorporated and has its domicile, requires that whenever such association shall declare any of its stock forfeited for non-compliance with its by-laws and regulations, the holder of said stock, if it is more than a year old, shall be allowed the withdrawal value of said stock, if a borrower from such building and loan association, after he has executed his mortgage upon said real estate and assigned his stock as collateral security and has carried his stock for more than a year, makes default in tne payment of the installments upon his stock, as . required by the by-laws and regulations of the association, and ceases to pay the interest and premium upon the

loan, upon the association declaring the stock forfeited, such borrower must be given the withdrawal value of his stock at the time of such forfeiture, which he is entitled to have credited upon the mortgage debt.

APPEAL from the City Court of Anniston, in Equity. Tried before the Hon. JAMES W. LAPSLEY.

The bill in this case was filed on May 8, 1896, by the appellee, Charles Nonnemacher, against the Pioneer Savings & Loan Company. The substance of the averments of the original bill, having regard to the paragraphs thereof, are as follows:

Sec. 1: Alleges that on or about August 1st, 1889, orator owned a certain lot (his homestead), which is described, in Anniston, and desiring to make additional improvements, applied to the National Building, Loan & Protective Union, a Minnesota corporation, for a loan of $4,800.

Sec. 2: Alleges that said corporation has changed its name to Pioneer Savings & Loan Co.

Sec. 3: Alleges that before the corporation would make the loan it required complainant to make certain advance payments, which he did, amounting to $366, and on the 2d day of December, 1889, he executed his non-negotiable note for $4,800, due 56 months after date, and secured same by a mortgage on said lot, which note and mortgage are attached as a part of the bill. Said note and mortgage were executed and delivered in Alabama and forwarded by defendant's agent to it and were made to secure said loan of $4,800. It was then further averred in said sections that although the note was given for $4,800, that the complainant had received only $4,339 of this amount, after deducting the advance payment as stated above, and that during the months following up to the maturity of the note, i. e., August 2, 1894, he had paid on account of said loan, including payments above named, $5,449, which was largely more than enough to satisfy the said amount he received and interest; said payments being made monthly and averaging from $91 to $106 per month. Complainant avers

that he has fully paid said loan and mortgage and there is nothing due thereon.

Sec. 4: Alleges that notwithstanding full payment of loan and interest, the defendant is claiming that he is largely indebted to it on account of the loan, and is proceeding to foreclose the mortgage and has advertised the property for sale.

Sec. 5: Alleges that notwithstanding full payment, as aforesaid, he has offered to make additional payments, at one time $500, and at another $750, both of which offers have been refused; the defendant demanding $1,700 or $1,800 as balance on said debt. Complainant avers he does not owe any such amount, or any amount on said mortgage debt, and avers that said contract is usurious and so appears on its face.

Sec. 6: Alleges irreparable injury to orator if defendant is allowed to foreclose the mortgage under the power of sale and that orator will be unable to have ascertained the balance, if any, due on the mortgage debt, and will not be able to redeem from the sale and will be deprived of possession of the premises.

After the usual prayer for process, the bill asks that the sale under the power be enjoined until it can be ascertained by decree whether there is really any balance due the defendant, and if so, what amount, and that upon payment of the balance so ascertained, which complainant offers to pay, said injunction be made perpetual.

There was attached to the bill as exhibit "A." the note which was given to the defendant and which was in words and figures as follows: "Minneapolis, Minnesota, December 2, 1889. Fifty-six months after date, for value received, I promise to pay to the National Building, Loan and Protective Union, a corporation duly organized under the laws of the State of Minnesota, the sum of four thousand eight hundred dollars, with 5 per cent. interest per annum and 5 per cent. premium per annum thereon from date until paid, payable monthly on or before the last Saturday of each month; principal, interest and premium payable at the office of the National Building, Loan and Protective Union

at Minneapolis, Minnesota. Any failure to pay interest or premium when due shall make principal, interest and premium at once due, and any waiver of such right shall not prevent the payee from enforcing the right upon any recurrence of the default. The shares of stock in the National Building, Loan and Protective Union held by the undersigned, as shown by certificate of stock No. 12,932, are hereby transferred and pledged to the National Building, Loan and Protective Union, as collateral security for the performance of the conditions of this obligation and of the mortgage securing the same. (Signed.) Chas. Nonnemacher, Melania Nonnemacher."

The bill was subsequently amended by adding after the averments of the third paragraph, the following averment: "That notwithstanding this, the defendant claims that on the 9th day of August, 1889, orator subscribed to 60 shares of stock in defendant corporation, which was issued to him on the 1st day of September, 1889, by which orator agreed to make certain payments on said stock and which, by its terms, was to mature in 5 years from its date, to-wit, September 1st, 1894, and in which the defendant agreed to pay orator $100 for each such share at that time, making in all $6,000 as the face value of said stock at its maturity; that it was transferred to defendant as collateral to said note and which stock defendant claims was to pay off said note at its maturity, provided certain payments (all of which were promptly made) were made to defendant by orator during said 5 years, and orator avers that the payments he made to defendant during said 5 years were largely more than enough to pay said note and satisfy said mortgage, and which amounted, as aforesaid, to $5,499, before said 1st day of September, 1894. Should your honor determine that orator is mistaken and defendant is correct in this contention, then orator avers that said stock is fully paid up and should be applied to the payment of said note, and when so applied, not only pays said note, but leaves the defendant due your orator a large sum in addition, to-wit, $1,200, with interest since the maturity of said stock, and orator asks

that so much of the value of said stock as may be necessary be appropriated to the amount ascertained by your honor to be due on said note; that all amounts paid to defendant by orator, whether upon said so-called stock, etc., or otherwise, or by whatever name called, were in fact payments on said mortgage loan and will by this court be so appropriated to such payment, and orator has a right to have, and asks to have it done by the court, as he had instructed defendant to do in August, 1894. Orator avers that said stock subscription was only a part of the plan or scheme by which orator procured said loan and was made for the further purpose of avoiding the usury statute of Alabama; that orator signed said subscription for the sole purpose, and only for the purpose, of securing and procuring said loan and was required by defendant of him before the said loan would be made, and orator avers that the said note on its face calls for the payment of 12 per cent. per annum interest on said loan. The word 'premium' therein is only another name for so much interest. Orator further shows that the said defendant, though conceding that by the terms of said stock certificate the said loan would be paid long before the maturity of said so-called stock on the 1st day of September, 1894, yet it claims and insists, in order to avoid the effect of said concession, that orator agreed in June, 1891, to postpone the maturity of said stock and continue payments indefinitely on said stock and that all payments made by orator were not payments on said loan, and that orator having ceased making payments to said defendant in August or September, 1894, the defendant had a right to declare said stock and all payments made by orator, and has declared it, forfeited to defendant, and to demand of orator the payment of the full amount of said note, interest and attorney's fees, but orator avers that said alleged agreement was void, (1) for lack of consideration, and (2), because it placed additional burdens and payments on his homestead, without the consent or concurrence of his said wife, and (3), because the same was based upon the insistence of a right alleged by defendant to exist and which was in fact un-

founded; that the claim of said defendant that it had a right to forfeit said payments and stock is unfounded in law and in fact. The statutes of Minnesota, where defendant resides and does business, which it alleges control in this whole matter, do not authorize such forfeiture. But if the court should determine that the said agreement modified the alleged stock contract so as to postpone the maturity of the stock indefinitely and was a valid contract by the defendant, then orator insists that the alleged effort of defendant to declare said stock forfeited, and said alleged forfeiture, was a conversion by defendant of the same and makes defendant liable in this court to orator for its value, which is shown by its letter, dated August 30, 1894, to be of the value of $3,492.12, and orator avers that he is entitled to have the value of said stock credited on said mortgage debt to be ascertained by your honor."

The prayer of the bill was subsequently amended by praying for the following additional relief: "That all payments made by orator to defendant, or any amount which may be found to be due orator on account of payments on said so-called stock, or the maturity of said stock, are on account of the conversion of said stock by defendant or otherwise to be applied to the payment of said mortgage debt. If your honor should find or determine that said stock is fully paid up, or that there is a balance due orator from defendant on that account, or on account of other payments made by orator on said so-called stock, or for or on account of said debt to defendant by complainant, or for any other account connected with or growing out of said loan, that orator may have a decree therefore, requiring defendant to pay the same, etc. That your honor have ascertained by appropriate decree and proceedings what, if any, balance there is due from said orator to said defendant on account of said loan, after deducting all payments and credits to which orator is entitled from said loan, and interest therefor. And that upon the payment by your orator of said sum so ascertained to be due and unpaid on account of said loan, that the said note and mortgage be ordered by your honor to be delivered up and

that the same be declared and decreed by your honor as
satisfied and cancelled, and your orator prays for such
other, further, general or special relief as may be agree-
able to equity or good conscience."

There was also attached to the bill as a part of ex-
hibit "A." the certain mortgage executed by the com-
plainant and embraces the property described in the
bill, dated December 2, 1889, and reciting that it is
given to secure said $4,800 with 5 per cent. interest and
5 per cent. premium per annum, both before and after
maturity, according to the condition of said note "being
for the money loaned to said parties of the first part as
members of said National Building, Loan and Protect-
ive Union," principal falling due 56 months after date.
The mortgage is further conditioned for the payment of
taxes and assessments for the keeping of the building
insured to an amount not less than $4,800 for the bene-
fit of the mortgagee and for the keeping of the property
in repair and that the mortgagor shall not commit or
suffer waste, and that upon the full performance of
these conditions the deed shall be null and void.   The
mortgage contains a power of sale upon default and
provides for an attorney's fee of $300 for foreclosing
the mortgage.   The instrument was duly acknowledged
by the husband and wife in the manner prescribed for
conveyances of homesteads by the laws of Alabama.
Said mortgage did not secure in any way the payments
by the complainant upon his shares of stock in the cor-
poration.

To the bill, as amended, the respondent demurred
upon the following grounds: "1. Said bill as amended
sets forth antagonistic and inconsistent claims to relief
upon the part of the complainant.    2. If said bill, as
amended was taken as confessed the court would be un-
able to frame a decree thereon, because said bill proceeds
upon the idea (1) that all payments made were made
upon the mortgage debt and that the said mortgage debt
has been duly paid off; and (2) upon the antagonistic
and inconsistent right to the effect that the payments
were made upon certain shares of stock belonging to
the complainant of the value of less than the mortgage

debt, which the defendant has converted, and the value of which less than the mortgage debt the complainant is entitled to have credited upon said indebtedness. 3. The bill as amended radically departs from the bill as originally framed.

"And the defendant demurs specially and separately to so much of said bill as seeks to set off against the mortgage indebtedness a claim of the complainant for the conversion of its stock, and for ground of demurrer assigns the following: 1st. It is not alleged in the bill that the defendant is insolvent and no other equitable reason is shown why the complainant should have a set off in this case. 2d. The complainant has a plain, adequate and complete remedy at law against respondent for said conversion, if unauthorized, as the bill alleges, and no reason is shown why resort to a court of equity is necessary to have the benefit of said claim. 3d. The bill fails to set forth the terms and conditions of the modified contract of June, 1891, or the terms and conditions of the stock subscription, or the payments thereon which the complainant was to make. 4th. The bill does not allege what payments complainant had made on his stock subscription, nor what were the terms of the contract in reference to applying the stock to the payment of the note secured by mortgage."

The defendant, on July 3, 1896, filed an answer which sought to reply to the representative paragraphs of the bill, and which was in substance as follows:

1. It admitted ownership of the lot by complainant, but called for proof of its homestead character, and admitted that he applied to the defendant corporation, then called the National B. L. & P. Union, for a loan of $4,800, said union being a mutual building and loan association, doing business under the laws of Minnesota, with its principal office in that State. The answer then alleged that on August 9th, 1889, complainant applied for 60 shares of Series A. stock in said union, and there was issued to him a certificate, making him a shareholder and agreeing to pay him $100 on each of said shares at the end of 5 years on certain terms and conditions therein stated, some of the conditions being that he was to make certain payments set forth in the answer.

2. The answer admitted the Pioneer S. & L. Co. to be the same corporation as the National B. L. & P. Union.

3. The answer denied the facts as alleged in section 3 of the bill in reference to the loan and payments and then averred as follows: That on August 10, 1889, complainant applied for a loan of $4,800 on his property, reciting that he was the holder of 60 shares of stock in the union, and agreeing to pay certain expenses attending the loan and on, to-wit, December 1st, 1889, the union agreed to make the loan, according to its rules, one of which was that only members could secure a loan; that thereafter the complainant executed the note and mortgage described in the bill, they being signed but not delivered to the union in Alabama; that defendant did lend him $4,800, and the answer shows the facts fully as to this,—how money was sent to a Talladega bank and what deductions were made, these being according to its rules, and to pay what he had become liable for, of which he had notice and to which he assented by accepting the money; that it was not true that he was making regular payments on said indebtedness, the facts being that he paid dues on his stock and interest and premium on his loan to June 29, 1891, when he entered into a new contract, not a dollar having been paid on the principal of the loan, the said contract of said date being exhibited with the answer; that under the latter agreement he paid dues on his stock and interest on his loan to September 1st, 1894, since which time he has paid nothing, and that at that time the value of payments, both dues and withdrawals, together with net profits to credits of shares, did not equal the mortgage debt.

4. It is herein set forth that for the default after September 1st, 1894, the directors, according to its rules and complainant's contract, declared his stock forfeited and credited the same to its lapsed share account; that payments were not made on the debt, except interest and premium to September 1, 1894, and that there remains due $4,800 with interest and premium from said date.

5.   It admits it is claiming an indebtedness from complainant, and is proceeding to foreclose the mortgage and that it has incurred costs and an attorney's fee therefore.   It admits refusing to accept $500 or $750 in full settlement.

6.   It denies the averment of section 6 of the bill and all other averments not in the answer specifically admitted or denied.

To this answer the defendant filed an amendment wherein the defendant denied the contract was usurious on its face and set up that if it was an Alabama contract the imputation of usury by reason of the agreement to pay 5 per cent. interest and 5 per cent. premium or 10 per cent., was neutralized by Section 5 of an Alabama act approved February 18, 1893, providing that "premiums shall not be treated as interest, nor render building and loan associations amenable to the laws relating thereto."   It was further set up that if it turn out to be a Minnesota contract, it was permissible by the laws of that State to contract for 10 per cent. interest per annum and was also provided by an act of that State, approved April 22, 1889, entitled "An act relating to Building, Loan and Savings Associations doing a general business," that "any premium taken for loans made by any association governed by the act shall not be considered or treated as interest, nor render such association amenable to the law relating to usury;" and that defendant was an association governed by said act.

On February 7, 1898, the defendant filed its answer to the bill as amended, reaffirming its answer of July 3, 1896, and answering particularly the allegations of the amended bill added after paragraph three.   The substance of this amended answer to the amended bill was as follows: Respondent admits it claims that on August 9, 1889, complainant subscribed for 60 shares of stock, and asserts its claim is true, referring to the application therefor, signed by him, and setting forth his agreement in reference thereto, which application was made through Ashley & Reardon of Anniston, Ala., who were the Union's agents, solely to solicit subscriptions for membership and sell shares of stock and to collect mem-

bership fees, with no authority to make or agree to make loans. This answer further alleged that the application was accepted and a certificate of shares issued him September 1st, 1889, to mature in 5 years, with the qualification that maturity value was to be paid upon condition of a full compliance on his part with the terms, conditions and by-laws printed on the face and back of the certificate, made a part of the contract, which certificate he transferred as collateral to his note of $4,800; that it was not true that defendant claimed said stock was to pay off the note at maturity, although if the stock had matured according to original contemplation of the parties and if he had complied with all obligations and if the contract had not been modified by mutual agreement the maturity value would have sufficed to pay the note and leave a surplus; that it is true he made the payments originally stipulated during five years, but before that time elapsed the parties modified the contract, wherefore he was not entitled to demand $6,000 at the end of 5 years. It denies payments made were more than enough to satisfy the note and mortgage, and avers same have never been paid. It denies that stock is fully paid up or should be applied to note or that it leaves defendant owing complainant $1,200. The answer then alleges that on June 29, 1891, the contract was modified by mutual consent, as set forth in the first answer. Respondent denies that the amounts paid were payments on the loan or that they will be so appropriated or that he is entitled to or instructed such appropriation in August, 1894; that he made no payment on the principal of said note, although up to September, 1894, he made monthly payments of 5 per cent. each for interest and premiums, all other payments being upon his stock, in accordance with his contract, as he well knew. Respondent denies that the stock subscription was part of a scheme by which he obtained the loan or that it was made to evade the usury laws of Alabama, and alleges that on August 9, 1889, he subscribed for 60 shares of stock, paid the membership fee, and that when he applied therefor respondent had not agreed to make him any loan, and was not advised

he desired a loan or that his purpose was to secure a loan, and complainants knew its soliciting agents had no authority to agree to make a loan or to accept an application for stock on condition that a loan would be granted; but complainant applied to the home office for a loan, which was taken up and decided on at Minneapolis, Minn., and granted according to its established rules, and it is denied that what was done was any part of a purpose to evade the usury laws of Alabama. Respondent was a mutual building and loan association dong business in many States, and had one uniform plan in all cases, before and since granting this loan, and it pursued no different method in this case. Respondent can not admit that complainant subscribed for stock solely to procure a loan, if so, his purpose was not communicated to it or its officers having charge of or authority in the conduct of its business. It is not true he was required by defendant to sign said subscription; that was voluntarily done by him, although the loan could not have been obtained without his acquiring shares, because it loaned only to members. It is not true that the note calls for 12 per cent. interest, it calls for 5 per cent. interest and 5 per cent. premium, which latter it says is not another word for interest, but it says the note is payable in Minnesota according to the laws of which parties may contract for 10 per cent. interest, and respondent is advised that the note signed in Alabama and payable in Minnesota might provide for the rate of interest allowed in either State, without being obnoxious to usury laws of Alabama, and that the contract is valid in Alabama and will be here enforced.

It is further averred that it is true respondent insists complainant has modified his original contract and again refers to exhibits A and B to its first answer; and that it is true respondent claims that all payments of complainant were not on the loan, and that he ceased payments after August, 1894, and that it has declared his stock forfeited, as set forth in its first answer. Respondent denies the agreement of June 29, 1891, was void for either of the reasons set forth in the amendment or for any reason;

it was not without consideration, nor did it place additional burdens on the homestead nor was it based on a right claimed which was unfounded; on the contrary, construed in reference to the circular letter of February 20th, 1891, exhibited with original answer and in reference to terms and conditions of certificate of shares, the contract is supported by a full consideration and was in effect a modification by mutual consent of the terms of the executory contract or contracts then existing between the parties.

The answer asserts the forfeiture of stock was fully justified by the original and modified contract between the parties, and denies such forfeiture was a conversion or that the value of the stock August 20, 1894, was as much as $3,492.12, or that he is entitled to credit the stock on the debt; in fact, the value of the stock August 30 and September 1, 1894, was $3,235.20, and no more, since which time complainant has paid nothing whatever on his shares, and hence the time has not arrived when he is entitled by the modified contract to apply stock to mortgage indebtedness.

There was attached to the answer as exhibits the communications from the defendant submitting to its many stockholders the proposed various plans or compromises referred to in said answer. The third plan so submitted and which was accepted by the complainant Nonnemacher, was as follows: "Third. That any holder of stock of Series A. who is a borrower, may execute to the Union, a contract, to be attached to and form a part of his certificate of shares, whereby he shall continue his regular payments of monthly, quarterly, and withdrawal installments, on his stock, and interest and premium on his loan, until such time as the actual value of the stock equals the mortgage debt, at which time the Union shall cancel his mortgage and note, with the stock, and all liabilities shall mutually cease."

There was also attached to the answer as an exhibit the agreement which was entered into between Nonnemacher and the defendant, and which will be referred to hereafter.

The evidence in the case shows, without dispute, the

following facts : The defendant is a mutual building and loan association, created under the laws of, and having its home office in, the State of Minnesota. The statute under which it was created is shown in the evidence. It was first called the National Building, Loan and Protective Union, but on May 26th, 1891, its name was changed to Pioneer Savings & Loan Company, without changing its identity. Its plan was to collect money by selling shares of its capital stock and collecting thereon monthly installments of dues, fines for non-payment when due, quarterly installments for expenses, and the loaning of money so collected to its members on real estate security. In August, 1889, Ashley & Reardon were agents of the Union at Anniston, Ala., with no other authority except to solicit subscriptions for membership, sell shares of stock and collect and receipt for membership fees. They had no authority to make loans. They were provided with application blanks, prospectus and advertising pamphlets.

On August 9, 1889, Nonnemacher applied through said parties for 60 shares of Series A stock, and in the application agreed to "abide by all the terms, conditions and by-laws contained or referred to in the certificate of shares" and "to comply with all the rules and regulations of the Union." The application, over his signature, contained this statement: "Solicitors and agents have no authoirity to make contracts regarding loans. Parties becoming members and desiring loans must confer with the home office. Agents may receive and receipt for membership fees only. This application and its acceptance constitute the contract."

Nonnemacher testifies this application for stock was his first connection with the Union, the receipt for which appears in evidence, and it states it binds the Union "for nothing further than a certificate of shares." On the same day, later in the evening, he paid the membership fee of $120, or $2 per share. On the following day (August 10), he made out a written application for the loan of $4,800, but failed to describe the property and it was returned for correction. When he applied for

loan he paid "six months in advance installments on my (his) stock for the purpose of having application for loan considered." "This amounted to $246, and with the membership fee of $120, constituted the $366 called by the bill "advance payments." The application for loan appears in transcripts and it appears therefrom that he wishes to borrow the money to improve his real estate. This application states he holds 60 shares of stock in the Union and that he had paid 6 months and 2 quarterly payments on the stock and that he would carry all the insurance that could be gotten and full amount of loan for the benefit of the mortgagee.

On November 30, 1889, the loan for $4,800 was allowed, and Nonnemacher, upon being notified thereof and receiving the note and mortgage from the defendant, executed each of them. The certificate of stock subscribed for by Nonnemacher was by him transferred to the defendant as collateral to the loan, and it was admitted by the complainant that he drew out all of the money which was sent to the Citizens' Bank of Talladega by the defendant company after the execution of the note and mortgage, and which was paid by installments as the improvements made by Nonnemacher progressed, and it was further shown that Nonnemacher consented to the deductions from the amount owing him on the advance payments, which were necessary under the rules and by-laws of the defendant to negotiate the loan. There was also introduced in evidence the by-laws and rules of the defendant company. The certificate of shares subscribed for by Nonnemacher and which was issued to him as a stockholder is attached as an exhibit to the deposition, and it provided, in brief, for monthly, quarterly and withdrawal installments, the latter not to exceed sixty in five years, for a forfeiture for non-payment, that agents act for the shareholder and that all payments must be made at the home office; that a cancellation fee of $3 per share must be paid at maturity of contract or when loan is procured; and the eleventh condition provides that if "it is deemed necessary by the board of managers to protect shareholders, the Union may require such payments to pay

off or cancel shares as in their judgment will be for the best interest or protection of all its members. If it is found necessary that such cancellation payment be required it will be collected the same as withdrawal installments are collected and shall not exceed 25 cents per share in any one month."

On February 20, 1891, the board of directors and the defendant seeing that they could not mature Series A stock in five years without making the protective assessments authorized by the contract, proposed to the holders of said series of stock various plans of settlement or compromise. Nonnemacher, the complainant in this case, accepted the third plan, which is copied above, and thereupon entered into an agreement with the defendant, which contained the following stipulation: "Being desirous of avoiding the assessments necessary to mature my stock at its full face value and of maturing, compromising and settling the same and all claims arising thereunder between me and the said Union, have this day accepted, approved and adopted, and do hereby accept, agree to and approve and adopt plan No. 3 as set forth in said resolutions; and herewith surrender my certificate to said Union for liquidation, cancellation, modification or settlement as in said plan proposed. I approve and adopt the action of said board of directors, not only in so far as the same affects the proposition so by me accepted, but also as the same may be accepted by any or all the other members of said Union, and I fully sanction and ratify the said resolutions and each and all of them."

It was further recited in said agreement by Nonnemacher that he is willing to accept at maturity the actual net value of such shares, instead of the par value, and in consideration of being released from liability to such assessments it was agreed between the parties that he should continue the monthly and withdrawal payments, together 85 cents per share per month, and 25 cents every third month, beginning with June, 1891, as and for an expense fund, payments to be made the last Saturday of each month, without notice; and it was further agreed as follows: "That whenever the

actual value of the payments heretofore made and hereafter to be made as aforesaid, both dues and withdrawals, together with the net profits to the credit of said shares shall amount to and equal the mortgage debt, then and not before, all such payments shall cease, and the certificate of shares and the shares they represent shall be cancelled, liquidated, satisfied and matured, and the said party shall thereupon be discharged from all liability thereon, in consideration of which the said second party agrees at that time to surrender and deliver, cancel and satisfy the note, mortgage and debt aforesaid, and all liabilities in the premises shall thereupon mutually cease and determine." The contract further provided for a continuance of monthly payments of interest and premiums as before, and preserved the right of forfeiture as prescribed in the original contract, and concluded thus: "It is further agreed, in consideration of the premises, that no assessments shall be levied by the second party, and the first party shall not be liable to any assessments upon the shares of stock aforesaid for the purpose of cancelling or maturing shares."

The complainant continued its payments through August, 1894, and then ceased all payments. It was shown that during that time he had paid on this stock as monthly installments $2,160; in quarterly installments $300; in withdrawal installments $855; amounting in all to $3,315, and that he had paid his interest and premiums on the loan to the amount of $2,280; all of said payments aggregating $5,595.

It was further shown by the evidence that when he ceased payments, the actual value of the stock did not equal the mortgage debt. On January 9, 1895, complainant's stock was declared lapsed and forfeited, it being more than 90 days in arrears. In Minnesota parties may contract for 10 per cent. interest and premium exacted by building and loan associations of members; and this exaction is not to be deemed interest nor to infect the contract with usury. The Union was national in character, doing business in many States, and all its proceedings and agreements were according to its uniform rules, applied in all cases, and were adopted without reference to com-

plainant, and were in no way intended as a plan to evade the laws of Alabama. The complainant having ceased all payments after August, 1894, the defendant, in 1896, proceeded to advertise the mortgaged property for sale, when this bill was filed and the sale enjoined.

On the final submission of the cause on the pleadings and proof, the judge of the city court, sitting as chancellor, rendered a decree overruling the demurrers interposed by the defendant to the amended bill, and further declared that the note and mortgage executed by the complainant had been fully paid, and ordered that the same be cancelled. It was further decreed that the injunction temporarily issued upon the filing of the bill be made perpetual, and that the complainant deliver up his certificate of stock and that the same be cancelled. From this decree the defendant appeals, and assigns the rendition thereof as error.

CABANISS & WEAKLEY, for appellant.—Repugnant and inconsistent claims to relief, in an amended bill render the same demurrable.—*Micou v. Ashurst*, 55 Ala. 607; *Ray v. Womble*, 56 Ala. 32; *Seals v. Robinson*, 75 Ala. 363; *Caldwell v. King*, 76 Ala. 149; *A. F. L. M. Co. v. Sewell*, 92 Ala. 163. When a bill presents the case in varied aspects each alternative must entitle complainant to precisely the same relief.—3 Brick. Dig., 378, § 183. Amendments must not make a new case or radically depart from the original cause of action. *Baker v. Graves*, 101 Ala. 247; *Ward v. Patton*, 75 Ala. 207; *Mobile Sav. Bank v. Burke*, 94 Ala. 125, and authorities in Code of 1896, § 106, note.

A mortgagor cannot resort to equity for relief against the mortgagee or mortgage debt merely on the ground that he has a demand against the mortgagee, which may be a proper subject of set-off.—*Gafford v. Proskauer*, 59 Ala. 264; *Tate v. Evans*, 54 Ala. 16. One who has made usurious payments on a debt cannot obtain a credit therefor, unless he distinctly and correctly sets forth in the pleadings, the terms and nature of the usurious agreement and the amount of the payments. *Munter v. Linn*, 61 Ala. 492; *Sec. L. Assn. v. Lake*, 69

Ala. 456; *Woodall v. Kelly*, 85 Ala. 368; *Moses v. B. &*
*L. Assn.*, 100 Ala. 465; *Stickney v. Moore*, 108 Ala. 500;
*Powell v. Crawford*, 110 Ala. 294.

Inasmuch as the contract was to be performed and
the money paid in the State of Minnesota, it was com-
petent for the parties to stipulate for ten per cent. inter-
est allowed by that State (if premium is to be treated
as interest), without offending the laws of Alabama.
*McGarry v. Nicklin*, 110 Ala. 559, 566; *Am. F. L. M. Co.*
*v. Sewell*, 92 Ala. 163, 171; *Hanrick v. Andrews*, 9 Port.
9; *Hitchcock v. U. S. Bank*, 7 Ala. 433; *Hunt v. Hall*, 37
Ala. 702; *Cubbedge v. Napier*, 62 Ala. 518; *Bennett v.*
*B. & L. Assn.*, 177 Pa. St. 233; 55 Am. St. Rep. 723; 34
L. R. A. 595; *Bank v. Cook*, 46 Am. St. Rep. 201 and
note; *B. & L. Assn. v. Ashworth*, (Va.), 22 S. E. 521;
*B. & L. Assn. v. Logan*, (C. C. A.), 66 Fed. Rep. 827;
*Peck v. Mayo*, (Vt.), 39 Am. Dec. 205; *Kennedy v.*
*Knight*, (Wis.), 94 Am. Dec. 543; *Thornton v. Dean*,
(S. C.), 45 Am. Rep. 796; *Wayne Bk. v. Low*, 81 N. Y.
566; *Bigelow v. Burnham*, (Iowa), 32 Am. St. Rep. 294;
*Junction, etc. Co. v. Bank*, 12 Wall. 226; *Cockle v. Flack*,
93 U. S. 344; *Cromwell v. County of Sac.*, 96 U. S. 51;
11 Am. & Eng. Encyc. Law, p. 417.

The position of Nonnemacher as a shareholder is
separate from his position as a borrower. He became a
shareholder, entitled to share in the profits, and his pay-
ments on stock dues under his stock subscription con-
tract cannot be treated as payments on his mortgage
debt.—*So. B. & L. Assn. v. Anniston L. & T. Co.*, 101 Ala.
582; *Richard v. B. & L. Assn.*, 21 So. Rep. 643; 49 La.
Ann. 481; *Eq. B. & L. Assn. v. Vance*, 49 S. C. 482; 27
S. E. 274; *B. & L. Assn. of Dakota v. Price*, 158 U. S. 45;
Endlich on Building Associations, § 452; 4 Am. & Eng.
Encyc. Law, (2d ed.), p. 1059; *Post v. B. & L. Assn.*, 97
Tenn. 408; *State v. Hornbacker*, 42 N. J. L. 635; *Pio-*
*neer S. & L. Co. v. Cannon*, 96 Tenn. 599; *Tilley v. B. &*
*L. Assn.*, 52 Fed. 618; *B. & L. Assn. v. Logan*, (Tex.),
33 S. W. Rep. 1088. The *Falls Case*, 97 Ala. 417, is dif-
ferent from this. There the court held, in view of the
peculiar features of the contract, that Mrs. Falls never
became a shareholder.

[Pioneer Savings & Loan Co. v. Nonnemacher.]

The fortfeiture was authorized by the contract and is valid.—*So. B. & L. Assn. v. Anniston L. & T. Co.*, 101 Ala. 582; *Freeman v. Ottawa B. & L. Assn.*, 114 Ill. 182; *Pioneer S. & L. Co. v. Cannon*, 96 Tenn. 599.

The contract of June 29th, 1891, was binding on Nonnemacher, since parties may at pleasure alter or modify a contract, a new consideration not being necessary; the alteration or modification being supported by the mutual assent of the parties.—*Robinson v. Bullock*, 66 Ala. 548; *Cooper v. McIlwain*, 58 Ala. 296; *Burham v. Martin*, 54 Ala. 122; *Lea v. Cassen*, 61 Ala. 312.

CALDWELL & JOHNSTON, *contra*.—It is contended in the answer of the defendant that after the expiration of the five years, this stock was forfeited. But this can not be. The Minnesota statute forbade it.—*Hockle v. Pioneer S. & L. Asso.*, 63 N. W. Rep. 243.

The contract entered into between the complainant and the defendant on June 29, 1891, by which the terms of the original contract were changed, was invalid and unenforceable, because such contract of June 29, 1891, was without consideration. The original contract was at that time executed. Everything had been done required of either party except the payment of the amount complainant had borrowed, and where this is true the contract is said by the courts to be an executed contract.—*Westmoreland v. Porter*, 75 Ala. 460; 3 Amer. & Eng. Encyc. of Law, 890, §§ 56-58, n. 1. No such assessments as were contemplated by the original contract had been levied against the stockholder by the complainant. The power to levy such assessments was, by the contract, placed in the board of managers. It could not, therefore, be exercised by the board of directors. Hence the proposed assessments, which were an inducement to the complainant to change his contract, would have been made without any authority. *Ely v. Blacker*, 112 Ala. 316; *Wrangler v. Swift*, 90 N. Y. 36; *Moses v. Tompkins*, 84 Ala. 613; *Holt v. Robinson*, 21 Ala. 111. To like effect are the following Alabama cases: *Allen v. Prater*, 35 Ala. 169; *Prince v. Prince*, 67 Ala. 169; *Ernst Bros. v. Hollis*, 86 Ala. 513;

*Russell v. Wright,* 96 Ala. 656; *Christian v. Insurance Company,* 101 Ala. 642; *Foster v. Bush & Co.,* 104 Ala. 669.

The alleged assessment made as claimed by the defendant is void. (1.) Because not made by the body authorized by the contract to make it. (2.) Because not made in accordance with the terms of the contract as to amounts, times and manner of payment. Said alleged assessment is an unfounded claim and could not have been enforced in the courts, and not being enforceable in the courts could not constitute a consideration for the alleged contract of June, 1891. Therefore, said alleged contract of June, 1891, being without consideration is not an enforceable contract— created no liabilities on complainant—conferred no rights upon the defendant. The complainant having paid all he agreed and undertook to pay has discharged his contract in full, and his mortgage is, therefore, fully satisfied.—*Cowan v. Sapp,* 74 Ala. 44; *Ib.,* 81 Ala. 525; *Braswell v. Williams,* 51 Ala. 539; *McArthur v. Dane,* 61 Ala. 529; *Cleere v. Cleere,* 82 Ala. 581.

The complainant was entitled to have the cash withdrawal value of the stock applied as a credit upon the mortgage debt and said indebtedness satisfied to that extent.—See Endlich on B. & L. Assns., §§ 374-452; *Nat. B. & L. Assn. v. Randall,* 60 N. W. Rep. 1019; *Ib.* 62 N. W. Rep. 262; *Robertson v. Assn.,* 63 Am. Dec. 145, 162. Also the exhaustive and lengthy opinion by the Supreme Court of North Carolina, in *Malony v. Atlantic B. & L. Assn.,* 47 Amer. St. Rep. 846.

DOWDELL, J.—The relief sought by the bill as originally filed was the injunction of the defendant's proceedings to foreclose the mortgage, and to have the mortgage decreed satisfied and cancelled. The prayer for relief was based upon the averment in the bill that the mortgage debt had been fully paid off and discharged. After the testimony in the cause had been taken, the bill was amended. A careful analysis of the amendment does not disclose a repugnancy between it and the original bill as to the relief sought. The

most that can be said of it is, that it contains alternative averments as to how the mortgage indebtedness had been settled. The relief sought, viz., a decree of satisfaction of the mortgage indebtedness, cancellation of the mortgage, and perpetual injunction of its foreclosure by the defendant, remained unaffected by the amendment. The amendment of the prayer for a decree over against the defendant, under one of the phases presented by the averments in the amendment, for any balance that might be ascertained to be due the complainant, was not inconsistent with the relief sought in the original prayer. The bill, as amended, was not open to the objection raised by the defendant's demurrer, and the same was properly overruled by the court.

The complainant was a borrowing shareholder in the defendant company, a mutual building and loan association, incorporated under the laws of the State of Minnesota, with its headquarters and home office in the city of Minneapolis. He subscribed for sixty shares of stock of the par face value of $100, paying a membership fee of two dollars per share. By the terms of the subscription contract, this stock was to mature at the end of five years, at which time the shareholder was to be paid its face value of $100 per share, he having complied with his part of the contract in the payment of the dues and assessments for which he as such stockholder under his contract was liable. On the day after subscribing for the sixty shares and paying the membership fee, he made application to the association for a loan which was subsequently obtained, and to secure the said loan the complainant executed the note and mortgage in question, and also placed with the defendant association his sixty shares of stock as collateral security for the loan. The mortgage debt was made due and payable at the time fixed for the maturity of the sixty shares of stock subscribed for and taken by complainant. The note provided for the payment of five per cent. interest and five per cent. premium *per annum* on the loan, payable monthly, and by the terms of the contract of loan. the note and mortgage were payable at the home office of defendant in Minneapolis.

[Pioneer Savings & Loan Co. v. Nonnemacher.]

One of the contentions of the complainant is that the subscription for the shares of stock and the borrowing constituted a single transaction, and was simply a con-. tract of borrow and loan, and that the form the transaction assumed, was a mere scheme and device to evade the usury laws, and that being such a transaction, the case comes within the influence of the *Falls Case*, 97 Ala. 417. This contention, however, is not supported by the evidence. In the construction of the contract in the *Falls Case*, the facts which led the court to the conclusion that the transaction was that of a loan simply, the shareholder having no participation in the profits and no voice in the management and control of the association, are widely different from the facts in the case before us. In the present case the shareholder not only participated in the profits with other shareholders of his class, but also had equal voice with other shareholders, whether borrowing or non-borrowing shareholders, in the management and control of the affairs of the concern. The evidence we think clearly and satisfactorily establishes the dual contractual relations of shareholder and borrower borne by the complainant to the respondent, and that the respective duties and obligations of shareholder and borrower resting upon him are separate and distinct, and upon this question, we fail to discover anything that distinguishes this case in principle from the case of the *So. B. & L. Asso. v. Anniston, etc. Co.*, 101 Ala. 582, which latter case was approved by this court in the recent case of *Sheldon v. Birmingham B. & L. Asso.*, 121 Ala. 278.

It is too well settled to admit of controversy, that where a contract is made in one State to be performed in another State the parties may contract for the payment of the highest legal rate of interest allowed by either State without offending against the usury laws of the other; the exception to the rule being, that this may not be done as a subterfuge and device, and where the purpose and intention of the parties is simply to evade the usury laws.—*Hayes v. B. & L. Asso.* 124 Ala. 663; *McGarry v. Nicklin*, 110 Ala. 559-566; *Am. F. L. M. Co. v. Sewell*, 92 Ala. 163-171; *Hanrick v. Andrews*,

35

9 Port. 9; *Hitchcock v. U. S. Bank,* 7 Ala. 433; *Hunt v. Hall,* 37 Ala. 702; *Cubbedge. v. Napier,* 62 Ala. 518. There is nothing in the evidence from which it could be reasonably inferred that there existed any sinster motive in making the note given for the loan payable in Minnesota. This being the place of respondent's home office, through which the loan was negotiated, and from which the money was sent, it was not unreasonable to stipulate for the performance of the contract as to payment at the home of the lender. It was lawful, and being lawful, of itself, could not be subject to imputation of bad faith. Besides, the form of the contract was the usual and customary one employed by the defendant in the transaction of the business for which it was organized, in the various States in which it did business, as well as in its home State, before and since the making of the contract with the complainant, and no exception, to what the evidence shows to have been universal practice in making loans to its members, was made in the complainant's case. The legal rate of interest in the State of Minnesota at the date of the contract, as shown by the statute of that State offered in evidence, was ten *per centum per annum.* This being true, it is immaterial whether the 5 per cent. denominated as premium, be regarded as additional interest or not, the total not exceeding ten *per centum per annum* on the loan, leaves the contract as to interest legal and non-offending as to the usury laws of that State.

This brings us to the consideration of the question of the alteration of the original stock contract as made by the agreement of June 29th, 1891. It might be here stated, that while the original stock contract entered into by the parties, was in a sense an executed contract, it was nevertheless in the performance of conditions attached to it continuing in its nature, and its completion dependent upon the performance of these conditions by the shareholder extending over a number of years. This rendered the contract as to the payment by the company of the face value of the shares at the date fixed for their maturity, as well as the payment by the shareholder of the assessments imposed upon his shares, in

its character executory. We think there can be no doubt
that such a contract may be modified or changed by the
parties without requiring a new consideration to sup-
port the alteration; the mutual assent of parties being
all that is necessary.—*Robinson v. Bullock*, 66 Ala. 548;
*Cooper v. McIlwain*, 58 Ala. 296; *Burnham v. Martin*,
54 Ala. 122; *Lea v. Cassen*, 61 Ala. 312. Moreover, the
change or alteration of the original contract made by
said agreement of June, 1891, was not without a con-
sideration. In the making of this agreement the re-
spondent parted with a valuable right which it had,
and the complainant released from a liability imposed
upon him, under the original contract. By this agree-
ment, the period for the maturity of the stock was
changed from a fixed and definite term, to an indefinite
time, and until the profits arising and appropriated for
the purpose were sufficient to mature the stock, or until
the value of the stock was sufficient to pay off the mort-
gage debt, when the same might be applied in discharge
of said debt and all liabilities between the parties can-
celled, and in consideration of this change, the com-
plainant was relieved of certain assessments for which
he was liable under the original contract. This liability
the complainant recognized, and it was immaterial
whether at the time of the alteration of the contract
as per said agreement, these particular assessments
had been actually levied and by the proper authorities,
or not, as the fact of the existence of the liability, and a
release therefrom, formed a sufficient consideration to
support the new contract.

Under this new contract the complainant made all
payments on his stock up to the 1st of September, 1894,
as well as the monthly premium and interest on the
loan, when he ceased to make any further payments
either upon the stock or the loan. At this time the re-
spondent held the sixty shares of complainant's stock
as collateral security for the loan, and also by the
statute of Minnesota offered in evidence was given a
lien upon the same to secure the loan made to the com-
plainant. That the stock had a cash withdrawal value
at the time of and subsequent to the default in payments

by the complainant, cannot be questioned, since this is settled by the statute of Minnesota, under the law of which State said corporation was chartered. Section 28 of an act of the legislature of Minnesota relating to building, loan and savings associations, approved April 22d, 1889, as certified and copied in the record, reads as follows: "Whenever any such association shall declare any of its stock forfeited for non-compliance of the holder with any of its by-laws or regulations the said stock shall, if one year old, be sold by said association at a monthly meeting thereof to the highest bidder, and it is made the duty of such association at any such sale to bid in the stock so offered at its then withdrawal value and thereupon said stock shall be cancelled, but if a higher bid is received, the person making the highest bid shall have said stock assigned to him, and upon such sale said association shall pay to the member so forfeiting his stock the withdrawal value thereof as fixed in section twenty-seven of this act, less all of the fines and arrearges assessed against him." By the provisions of this statute it was put beyond the power of the association to deprive the holder of stock more than one year old, of its withdrawal value, for any non-compliance by such holder with any of its by-laws or ordinances.—4 Am. & Eng. Ency. Law (2d ed.), 1046. As shown by the correspondence between the parties, this right of the complainant to the withdrawal value of his stock, at the time he ceased making payments on the same was recognized by the respondent association, and also after the time that the association claims that the stock was forfeited by the general resolution passed by the board of directors. The facts in this case as to this question distinguish it from the case of the *Southern Building & Loan Association v. Anniston Loan & Trust Co.*, 101 Ala. 582, where it was held that the forfeiting stockholder was not entitled to credits on the loan debt on account of payments made by him on his stock. There was no statute in that case giving withdrawal value to stock in the event of forfeiture by the holder of such stock, nor was there any recognition of such right by the

association. We think an accounting should be had be-
tween the parties, and the withdrawal value of the 60
shares at the time of the default in payments by com-
plainant, which were held by the respondent as collat-
eral security for the loan, be ascertained, and when so
ascertained should be credited upon the loan or mort-
gage debt, and the balance, if any, with interest, would
constitute the amount to be paid by the complainant.

The decree of the city court being contrary to the
views herein expressed must be reversed, and the cause
will be rmanded for further proceedings to be had in
accordance with the conclusions above stated.

Reversed and remanded.