4 So.2d 400

**SOUTHERN RY. CO. v. LOUISVILLE & N. R. CO.**

**8 Div. 28.**

Supreme Court of Alabama.

Oct. 9, 1941.

Rehearing Denied Nov. 13, 1941.

J. T. Stokely, of Birmingham, S. A. Lynne, of Decatur, A. H. Carmichael, of Tuscumbia, Wert & Hutson, of Decatur, and S. R. Prince, Jr., and Sidney S. Alderman, both of Washington, D. C., for appellant.

Chas. H. Eyster, of Decatur, Robt. E. Steiner, Jr., of Montgomery, and Edw. S. Jouett and J. H. McChord, both of Louisville, Ky., for appellee.

**BROWN, Justice.**

This appeal is from an interlocutory decree sustaining the complainant's demurrer to the respondent's amended statutory cross-bill.

The original bill was filed April 17, 1937, under the Declaratory Judgment Act of 1935, Acts 1935, p. 777, Code 1940, Tit. 7, §§ 156–168, seeking a decretal declaration that it is entitled to a reduction of the "rent basis" provided in the contract entered into by the predecessors in title and right of the parties July 25, 1889, for the construction, maintenance and use of the "Gurnee Junction-Blocton Line" of railway, without the payment of "retirement losses."

The respondent, by answer and cross-bill, denies such right and asserts that the payment of retirement losses on a basis of wheelage is a prerequisite to complainant's right to a reduction of the rent basis as a consequence of the abandonment and junking of parts of said system.

The rent basis for the use of said system by the complainant is fixed by the contract at one-half of the capital cost of construction on which complainant and its predecessor in right payed a rental of 5% per annum. Capital losses, as applied to the parts of the system abandoned and junked, were the costs of construction less the junk value of the salvaged material. "Wheelage basis" as used in the contract is the comparative use by the respective parties of said line in the operation of their respective trains.

The assignments of error present the question of the sufficiency of the averments of the cross-bill, to warrant a decretal declaration that the complainant, under the contract of July 25, 1889, is obligated to pay to the respondent, appellant here, a portion of the "retirement loss," on a basis of wheelage, as a prerequisite to complainant's right to claim a reduction of the "rent basis."

■ The allegations of the original bill admitted by the answer, and cross-bill, will be read into the cross-bill and considered along with the affirmative allegations of the cross-bill made as a basis for such relief, and doubtful intendments will be resolved against the pleader. Donald v. Reynolds, 228 Ala. 513, 154 So. 530; Ashurst et al. v. Ashurst, 175 Ala. 667, 57 So. 442; Blount County Bank et al. v. Harvey, 215 Ala. 566, 112 So. 139; Kelen v. Brewer et al., 221 Ala. 445, 129 So. 23; Scharfenburg v. Town of New Decatur, 155 Ala. 651, 47 So. 95.

So considered, in the light of judicial knowledge, the cross-bill in short alleges that the contract was entered into on July 25, 1889, by and between the Brierfield, Blocton & Birmingham Railway Company, the predecessor in right and title of the appellant, and the Birmingham Mineral Railway Company, the predecessor in right of the appellee, the Louisville and Nashville Railroad Company.

The immediate predecessor of appellant was the East Tennessee, Virginia & Georgia Railway Company. The subject matter of the contract was the construction, maintenance and use of a railway line through the coal fields between what became to be known as Gurnee Junction and Blocton, Alabama, and after its construction was known as the "Gurnee Junction-Blocton Line."

The construction of the line was commenced by the Brierfield Company, was

completed by the East Tennessee, Virginia & Georgia Railway Company, at capital costs, in round numbers of $502,000, and after appellant succeeded to the right and full ownership from its predecessor in title, it constructed additional branches, spur tracks and facilities for reaching and handling the coal output of the mines developed in the area, increasing the capital investment to approximately one million dollars.

The contract stipulated that the owner should operate and control said line by its own agents and servants, whose selection should be satisfactory to the Birmingham Mineral Railroad Company, and said Birmingham Mineral Railroad Company should have the joint use of said line for the operation of its trains in hauling the coal and other freight along the same. For this use it agreed to pay "as and for an agreed rent, a sum equal to 5 per cent (5%) per annum" of one-half of said total cost.

It was further stipulated in paragraph "4" of the contract: "It is agreed that the *costs* of renewals, repairs and maintenance, including taxes *and any other charges* of or pertaining to said portion of said railroad, and sidings, spur tracks, and appurtenances, is to be borne by the parties hereto on the basis of wheelage, and the Birmingham Mineral Railroad Company agrees that it will, during the continuance of this contract, pay over to the Brierfield, Blocton & Birmingham Railway Company *in monthly installments* its full proportion of said cost when divided between the parties hereto upon the said basis of wheelage." [Italics supplied.]

In the beginning of its use by the Birmingham Mineral Railroad Company, it paid rent, therefor, on the ascertained basis of the original capital investment, $502,-000, and when the capital investment was increased by the construction of the additional branches, spurs and facilities, the rent basis was increased to approximately one million dollars, and complainant and its predecessor in right paid rent on this increased basis.

The complainant and its predecessor in right has never claimed or had possession or control of said line, but has had the use thereof jointly with the owner in consideration of rent paid annually, and maintenance cost, paid monthly, each of the parties operating their own trains by their own employees, under the superintendence and control of the owner's employees.

The term of the contract is for 99 years, and the parties have been operating thereunder beginning in the year, 1890, for a period of 47 years before the bill in this case was filed, April 17, 1937.

The cross-bill alleges: "It is admitted that subsequent to respondent's acquisition of said properties of the East Tennessee, Virginia & Georgia Railway Company, respondent, pursuant to said contract and with mutual consent of the parties and for their joint benefit, has made certain additions and betterments to the main Gurnee Junction-Blocton line and has constructed certain additional spur tracks, branches, connections and other facilities which entered into and became part of the joint venture under said contract, and the total agreed actual cost to respondent of all of which was, by mutual consent, and as contemplated and required by said contract of 1889, written into and added to the rental base and thereby increased the 'agreed rent' payable and paid by complainant. It is admitted that, as the result, the rental base has been expanded, pursuant to said contract, until complainant has been obligated to pay and has been paying for many years past, as required by said contract, rental upon a total agreed cost to respondent, or rental base, of approximately but somewhat less than one million dollars, none of which cost was paid for either by complainant or its predecessors *otherwise than* by paying interest rental on one-half thereof, but the whole of which has been paid for either by respondent or its predecessors in title, all as contemplated by the contract. It is admitted that no demand has been made on complainant or its predecessors to bear or pay any part of *such original construction cost otherwise than by paying interest rental on one-half thereof, as provided by said contract.*" [Italics supplied.]

The cross-bill, in paragraph 5, alleges: "The said contract provided for a sharing between the parties of total costs. Each party was to and did perform its own train operations, bearing its own costs thereof. The original investment cost laid out by the owning Brierfield Company and its successors in construction of the facilities covered by the contract was to be shared by the joint adventurer Birmingham Mineral Company and its successors *by the payment, for the life of the contract, of an agreed rental equal to five per cent per*

*annum on one-half of the total actual cost to the Brierfield Company and its successors of the properties built pursuant to the contract, including all extensions, additional branches and other facilities built by mutual consent for joint use. All other costs or charges were to be divided* and borne by the respective parties on a wheelage basis." [Italics supplied.]

The allegations of the cross-bill referred to in the answer and relied on in the cross-bill to support the conclusion of the pleader as establishing a uniform practice of adjustment of accounts between the parties, through their respective accounting departments, involving numerous items, including items of "retirement losses," are:

"The question as to the proper method of handling and accounting for retirements and losses on retirements accordingly first arose between the parties in 1922, as follows: During the period from about 1904 to the federal control of railroads during the World War a large number of controversies, small in individual items but attaining substantial proportions in total, arose between complainant and respondent in connection with said joint trackage arrangement, and accumulated and remained unadjusted for a number of years, and their adjustment was further delayed by federal control, during which properties of both were in the possession of and were operated by the federal government. Most of these items in controversy involved the amounts of particular charges by respondent into the capital account or interest rental base for said joint trackage in connection with particular items of construction agreed to by complainant but where the amount of the charge to capital account had not been agreed to by it. A certain extension of the joint trackage, built by mutual consent, pursuant to Article 4 of the contract of 1889, completed about September, 1908, to serve Galloway Coal Company, was thereafter carried in the joint capital account and jointly used by the parties. Certain minor disputed questions as to the cost at which this extension was carried in the capital account were a part of the accumulated controversy hereinbefore referred to and remained unsettled until the general settlement of all said controversial items in November, 1924. In the meantime, the said Galloway extension became useless to complainant and respondent and was physically retired, by mutual consent, in March, 1917. In November, 1919, in response to complainant's request in connection with the disputed cost value of this track as carried in the joint capital account, respondent furnished complainant with elaborate detailed information as to the various cost items on this track, together with similar details as to a number of other portions of the joint trackage the capital cost value of which *were in controversy.* Settlement of the accumulated cost item controversy was thereafter delayed by federal control. The parties resumed said controversy after termination of federal control and gradually settled many of the disputed items. On July 25, 1922, respondent, pursuant to its construction of the meaning of the contract of 1889 and as to the proper method of handling and accounting for retirements and retirement losses thereunder, sent complainant a bill for its wheelage proportion of the loss on retirement of the Galloway track and proposed, upon complainant's acceptance and agreement to pay that bill, to deduct the cost value of that track from the joint capital account or rental base and to refund to complainant the interest rental it had paid on that value since the physical retirement of the facility in March, 1917, excluding the period of federal control. Complainant in numerous writings signed by it fully agreed to the principle and method of the accounting thus proposed, fully agreed to accept and pay bill for its wheelage proportion of the retirement loss in consideration of respondent's deducting the cost value from the capital account or rental base and adjusting the interest rental paid thereon back to the date of physical retirement, and only continued to question the amount of certain cost items going to make up the value of the Galloway track as carried in the capital account and certain items as the amount of salvage to be credited on the retirement. These questions, together with the other disputed items on other facilities constituting the accumulated general controversy, continued to be the subject of correspondence between complainant and respondent until November, 1924. At about that time accounting officers of both parties met in Louisville, Kentucky, at the home offices of complainant, spent several days going over all the remaining items in dispute and arrived at a full, final and agreed settlement of all matters in dispute. In this settlement all questions as to the cost value and salvage of the Galloway track were adjusted, as were all other similar questions as to other portions of

the joint facilities under the contract of 1889. And as a part of the said settlement complainant reaffirmed its agreement as to the method of handling and accounting for the retirement of the Galloway track and for the retirement loss thereon. The said general settlement and agreement was fully confirmed by complainant in writing signed by it on November 19, 1924, in which, among the various items agreed upon, it specifically agreed and promised to pay corrected bill as agreed for its wheelage proportion of the net loss on re-retirement of the Galloway Coal Company track in the amount of $7,685.70, authorized respondent to add a net total of $21,-941.13 to the total joint capital account or interest rental base, and authorized respondent to draw draft on complainant for a balance of accumulated rental due under the contract of 1889 of $35,763.98. [Italics supplied.]

"The said agreed settlement was duly carried out as authorized. Complainant paid respondent's bill for its wheelage proportion of the retirement loss on the Galloway track in the amount of $7,685.70, in consideration of which respondent deducted the settled and agreed value of that facility in the amount of $18,977.09 out of its joint capital account and refunded or credited to complainant $2,688.45 interest rental on one-half of $18,977.09 which it had paid from March 1, 1917, 'to date of settlement, excluding the federal control period.

"At the time of the said general settlement of November, 1924, there was another instance of a retirement of a portion of the joint facilities likewise in the course of settlement, to-wit, a house track at Hargrove, Alabama, carried in the capital account at a cost of $228.88, retired in January, 1924, and in the same settlement the matter of the correct handling of this retirement and of the loss thereon was likewise handled in the same manner as was the matter of the Galloway track, the said agreed handling being likewise evidenced by writings signed by complainant. Respondent pursuant to said settlement billed complainant for $118.32 as its user proportion of the loss on retirement of the house track at Hargrove, complainant paid the said bill on October 28, 1925, and respondent took the $228.88 agreed value of that facility out of the capital account or rental base retroactively to January, 1924, the date of physical retirement, and credited or refunded to complainant the interest rental it had paid on that valuation since that date.

"Following the said settlement of 1924, the parties have uniformly and without variation followed the principles and practices there agreed upon and applied as to retirements of portions of the joint trackage and facilities under the contract of 1889 which have been retired as no longer useful, and complainant has always confirmed the said practice and has never in any way questioned it or sought to repudiate it until Novemer 4, 1936, when a newly elected President of complainant wrote the President of respondent a letter in which he, and the complainant through him, for the first time undertook to repudiate the settled and agreed practice which had been uniformly followed since the settlement of 1924 and to assert the wholly inconsistent position now asserted by complainant in its Bill in this cause. It was that letter which provoked and produced the present actual controversy between the parties. And in pursuance of said settled and agreed practice, from November, 1924, to as late as May 2, 1936, the parties have consistently and uniformly handled and accounted for retirements of portions of the joint facilities and for retirement losses thereon."

These averments show at most two settlements, the settlement of November, 1924, involving a number of items, and the settlement for the account of October 28, 1925. There is nothing in these averments to warrant the conclusion that the contract of July 25, 1889, has in any sense been changed or modified. Both parties are standing on the contract, and as we understand appellant's contention, it is that the words in paragraph 4 of the contract *"and any other charges,"* render that paragraph ambiguous, and makes applicable the doctrine of contemporaneous or practical constructions, by the parties in their subsequent dealings in respect to the subject matter of that paragraph. [Italics supplied.]

After mature consideration, we are not of the opinion that said paragraph is ambiguous. At the time said contract was entered into, as a matter of judicial knowledge, railroad building and mining developments were at their zenith, and the question of abandonment of railroad properties was not a matter within the contemplation of the parties. The term "any other charges" clearly referred to charges

relating to current expenses of operation and maintenance to be adjusted in monthly settlements between the parties. ·

Moreover, the contention of appellant, and said alleged "uniform practice," is in conflict with the affirmative allegations of the cross-bill, that: *"The original investment cost laid out by the owning Brierfield Company and its successors in construction of the facilities* covered by the contract was to be shared by the joint adventurer Birmingham Mineral Company and its successors *by the payment, for the life of the contract, of an agreed rental equal to five per cent per annum on onehalf of the total actual cost to the Brierfield Company and its successors of the properties built pursuant to the contract,* including all extensions, additional branches and other facilities built by ·mutual con-·sent for joint use. *All other costs or charges* were to 'be divided and borne by the respective parties on a wheelage basis." [Italics supplied.]

The contract clearly did not contemplate that the capital cost should be twice returned to the owner, first in rent and again in "retirement losses."

■ It is the settled law in Alabama, that: "Where the meaning of a contract is clear, and free from ambiguity, the subsequent conduct of the parties, in supposed observance of its terms, cannot be considered as aids in its construction." Twin Tree Lumber Co. v. Ensign et al., 193 Ala. 113, 119, 69 So. 525, 527; Hattemer v. State Tax Commission, 235 Ala. 44, 177 So. 156.

■ The settlements concluded by the parties in 1924 and 1925, and subsequent thereto, are binding between the parties in respect to the items of accounts involved, but as pleaded, do not preclude the complainant from asserting that it is not liable to return the capital expended by the owner in constructing the line of railroad and its extensions in the form of "retirement losses." Twin Tree Lumber Co. v. Ensign et al., supra.

The appellant's second contention is that the contract provides for one unitary rental on the entire joint facility, and contains no provision for reduction in rent or rental base, nor any covenant on the part of the owner to repair.

■ The contract is sui generis. It conferred on the appellee and its predecessor, the right of joint user with the owner, in consideration of payment of rent, and an agreement to contribute, on a basis of wheelage, to the upkeep and maintenance of the line and its facilities. While the right it ·confers may not be, strictly speaking, an easement, it is a right of user in the nature of an easement, and the agreed rent and the obligation to contribute to upkeep is based on the *right of user.* The contract does not fix the rent basis in figures, but sets up a method of ascertaining and fixing the same. Its language in respect thereto is:

"The said Brierfield, Blocton & Birmingham Railway Company agrees to proceed with all convenient dispatch to construct and complete its line of railroad to Blocton, Alabama. And upon completion of the said line of railroad the Brierfield, Blocton & Birmingham Railway Company agrees to render to the Birmingham Mineral Railroad Company an account showing the total actual cost of all that portion of said line of railroad which lies between · the point at which the line of railroad that the Birmingham Mineral Railroad Company is to construct, may intersect and Blocton, together with the spur tracks, sidings and other appurtenances necessary for the transaction of business, and including the cost of right of way and of any other lands required for the purpose of construction and operation of said portion of said line, said actual cost of that portion of the road *leased* to be evidenced by vouchers duly approved by the Chief Engineer of the Brierfield, Blocton & Birmingham Railway Company, and by an engineer to be appointed by the Birmingham Mineral Railroad Company. In case of disagreement between the said engineers as to any of the amounts included as part of the cost of constructing that portion of the road leased and to be leased, it is agreed that Mr. T. H. Aldrich shall act as arbitrator, or, if for any reason he fail to, or be unable to act, the matters in dispute shall be decided by a competent disinterested civil engineer of experience, decision of said Aldrich, or in case of his failure to act, of the disinterested engineer appointed, to be final. .

"And said Birmingham Mineral Railroad Company agrees, during the continuance of this contract, to pay over to the Brierfield, Blocton & Birmingham Railway Company, *as and for an agreed rent,* a sum equal to five per cent (5%)

per annum on one half of the said total cost so to be ascertained.

"In consideration of said payment so to be made, the said Birmingham Mineral Railroad Company shall have equal rights with the said Brierfield Blocton & Birmingham Railway Company to the use of the above described portion of the said railroad and the sidings and spur tracks there, and also to the use of all extensions or branches thereof which shall be made by mutual consent of the parties hereto, for and during the entire period of ninety-nine (99) years from the date of completion of said portion of said railroad hereinbefore described, for which the said Birmingham Mineral Railroad Company agrees to pay the said Brierfield, Blocton & Birmingham Railway Company five per cent (5%) per annum upon one-half of the cost thereof, as aforesaid." .

The argument of appellant is that abandonment and discontinuance by mutual consent of the parties, of said "extensions or branches" made by appellant after it acquired the ownership of the property, under paragraph 2, quoted above, and inasmuch as there is no express provision for a reduction of the rent basis, and no covenant on the part of the owner to maintain, it can abandon all of said extensions and branches, which cost in round figures, approximately a half million dollars, and the appellee must continue to pay rent for such abandoned facilities, for the use thereof for the unexpired period of the contract—50 years—on the basis of the capital investment expended in their construction.

To this we can not agree. The contract clearly contemplated that the rent basis should be fixed from time to time as facilities were added to the system. This much is conceded by the appellant.

■ There is a familiar principle, well established in the law of contracts, that "Even though the promise of one of the parties to a bilateral contract is not stated expressly therein, such promise is sometimes implied from the nature or terms of the contract." 6 R.C.L. § 95, and authorities cited in Note 37.

■ That principle is applicable here. The appellant and its predecessors agreed to furnish tracks and tracking facilities for the use of the appellee and its predecessors in consideration of the payment of a sum equal to 5% on one-half of the capital expenditure in construction, to be ascertained from time to time during the life of the contract, and when by the mutual consent of the parties such tracks and tracking facilities were abandoned and their use terminated, by necessary implication, the owner must be held to have agreed that the rent basis should be readjusted, by ascertaining the capital cost of the facilities remaining for the joint use of the parties.

We are therefore of opinion that the circuit court did not err in sustaining the demurrer to the cross-bill.

Affirmed.

GARDNER, C. J., and THOMAS and FOSTER, JJ., concur.