COMMERCIAL CONTRACTORS, INC.,
Plaintiff-Appellant,

v.

UNITED STATES FIDELITY & GUAR-
ANTY COMPANY, Defendant-Third-
Party Plaintiff-Appellee,

v.

R. B. ETHRIDGE & ASSOCIATES,
INC., et al., Third-Party
Defendants-Appellees.

No. 74–2026.

United States Court of Appeals,
Fifth Circuit.

Sept. 29, 1975.

As Modified on Denial of Rehearing
Nov. 21, 1975.

James E. Clark, Birmingham, Ala., W. Gerald Stone, Bessemer, Ala., Champ Lyons, Jr., Montgomery, Ala., for plaintiff-appellant.

Tommy E. Hill, Birmingham, Ala., for R. B. Ethridge & Associates, Inc. and others.

Ollie L. Blan, Jr., S. R. Starnes, H. L. Ferguson, Jr., Birmingham, Ala., for U. S. Fidelity & Guaranty Co.

Before BROWN, Chief Judge, WISDOM and COLEMAN, Circuit Judges.

COLEMAN, Circuit Judge.

Although building construction contracts generally fall within the more elementary ambits of the law, this appeal, taken from the results of a prolonged jury trial, presents us with a labyrinthian confusion of law and facts. A general contractor sued his subcontractor and the surety on the performance bond for damages allegedly sustained by nonperformance of a masonry subcontract. This terminated in a judgment for the subcontractor and against the general contractor for $185,000.

We reverse and remand for a new trial.

Perhaps the best way to accomplish a clarification of the maze would be first to recite the facts.

I

*Facts*

In the summer of 1970, Commercial Contractors, the general contractor, undertook plans to build for Urban Turnkey Housing, Inc. (Commercial's wholly owned subsidiary) a 200 unit low cost housing project in Bessemer, Alabama.

Upon completion, Urban Turnkey planned to convey the facility to the Bessemer Housing Authority.

The September 9, 1970 sales agreement between Urban Turnkey and the Bessemer Housing Authority called for delivery of the facility no later than July 16, 1971. The September 17, 1970 construction agreement between Commercial and Urban Turnkey stipulated project completion by July 1, 1971.

In anticipation of coming events, Commercial Contractors had already put the job out for bids from interested subcontractors.

On August 17, 1970, R. B. Ethridge & Associates (Ethridge) submitted bids on the concrete and masonry portions of the project. Ethridge was eventually awarded these subcontracts. Ethridge completed the concrete work and was paid accordingly. We are now concerned only with the masonry subcontract.

On September 21, 1970, Commercial mailed Ethridge the written contract for the masonry subcontract, priced at $700,-000.

On September 25, Commercial mailed the Bessemer construction schedule to all subcontractors. The accompanying letter explained that this schedule was the one referred to in the subcontract agreement. The schedule was prepared in the form of a "bar chart", which is a graphic display indicating the sequence and allotted time for each item of work on the project. This tells a contractor when he is expected to begin and finish each task on the job. The critical item of the schedule was that it allotted twenty two weeks for the completion of the masonry work.

The cover letter explained that specific calendar dates were not included in the bar chart. A worker's strike made it impossible to specify a date for the work to begin—*the dates would be inserted when the strike ended.* Ethridge was requested to acknowledge receipt of the schedule by initialing the cover letter and by returning it along with the executed subcontract.

The cover letter and attachments reached Ethridge's office on September 28. One of the firm's engineers placed the name of the firm and his initials on the cover letter *only* and returned it to Commercial, received there on September 30.

It was not until November 10, 1970 that Ethridge's executed masonry contract reached Commercial. This was of no moment because the strike was still in progress and no work could have begun in any event.

When the cover letter of September 25 was received, R. B. Ethridge was out of town and testified that he never saw the accompanying construction schedule. The initialing engineer testified that he never opened the packet which accompanied the letter. We digress here long enough to say that assuming this testimony to be true, we attribute no legal significance to it.

 In the first place, the letter received at Ethridge's office was notice of the completion date, regardless of whether any officer or responsible employee chose to read it. In the second place, even if a jury should believe that a contractor would sign a $700,000 contract without bothering to learn the specified completion date, it nevertheless remains the law, at least in Alabama, that in the absence of fraud or misrepresentation, one who executes a written contract in ignorance of its contents cannot plead that ignorance to avoid the obligation, *Colburn v. Mid State Homes, Inc.*, 1972, 289 Ala. 255, 266 So.2d 865; *Eley v. Brunner-Lay Southern Corporation, Inc.*, 1972, 289 Ala. 120, 266 So.2d 276; *Grady v. Williams*, 1954, 260 Ala. 285, 70 So.2d 267; *Ben Cheeseman Realty Company v. Thompson*, 1927, 216 Ala. 9, 112 So. 151.

About December 29 the worker's strike was near settlement and Ethridge received a construction schedule from Commercial which had the specific dates filled in on the time axis, showing the same sequence for the masonry work as

specified on September 25 and specifying the same twenty-two weeks for the performance of the work.

When he saw the schedule R. B. Ethridge became concerned about the manpower requirements of the subcontract. He immediately asked his project manager for the Bessemer job to calculate the number of masons required to maintain the schedule. Lipscomb calculated that the sequence of work, as stated in the December 29 schedule, would place a stringent burden on Ethridge's manpower capabilities.

On January 4, 1971, R. B. Ethridge and Fred Lipscomb attended a preconstruction conference called by Commercial, whose attending representatives were Cecil Williams, senior vice president in charge of construction and design; Mac Saxon, project manager for the Bessemer job; and C. C. McDuff, on-site supervisor for the Bessemer job. At this January 4 meeting R. B. Ethridge raised objections to the sequence of work set forth in the December 28 construction schedule. He felt that the sequence should be altered so that there would be a more even distribution of manpower throughout the entire job.

The significant point is that Mr. Ethridge expressed no objection to the twenty two weeks allotted for completion of the masonry work.

Commercial allowed Ethridge to submit a revised schedule so as to level the manpower curve on the job. This was done in mid-January and it was incorporated in Commercial's revised schedule dated January 29, 1971. The revised schedule continued to show the total time for performance as twenty two weeks, so Ethridge was due to complete the masonry subcontract on June 11, 1971, the same completion date required by the December 28, 1970 schedule.

Ethridge also talked to Cecil Williams about alterations in the schedule due to bad weather conditions. Ethridge testified that Williams told him the schedule would be updated every couple of weeks so as to reflect adjustments for bad weather. On March 25, 1971, Commercial sent out a revised schedule which indicated adjustments for bad weather conditions through March 10, 1971. The cover letter enclosed with the new schedule stated that the dates reflected on this schedule were the maximum dates allowable for performance. According to this schedule, Ethridge was to complete all masonry work by July 16, 1971. This allowed five weeks of additional time over that set forth in the revised schedule of January 29, 1971.

Under subcontract change order number 1, dated May 6, 1971, Ethridge, by mutual agreement, had been relieved of responsibility for work on ten of the forty buildings on the project, which reduced the total of Ethridge's original contract by $142,000.

About the middle of June, an out-of-town masonry subcontractor was employed on a cost plus basis to do the masonry on the ten buildings which Ethridge had dropped. This subcontractor began paying his brick masons twenty five cents an hour above the union scale, plus seven dollars a day traveling expenses. When Ethridge's masons learned of this some of them defected to the higher paying employer. By about July 1, this discernibly slowed Ethridge's operations. When this was called to Commercial's attention, it arranged with the cost plus contractor not to hire any more of Ethridge's masons.

In mid-July the carpenter subcontractor was terminated and there was a shortage of carpenters until another carpenter subcontractor could be found. This, to some extent, slowed Ethridge's progress.

The evidence, however, clearly indicates that the prime cause of Ethridge's difficulties was its inability to hire a sufficient number of brick masons, and this factor existed from the very outset of the project. Moreover, it appears that in the early stages of the project Ethridge did not order the materials required to allow the work to proceed on schedule.

As of August 2, 1971, Ethridge had completed no more than 65% of the ma-

sonry work on the thirty buildings remaining in its subcontract. On that day Commercial notified Ethridge that its contract would te terminated as of 5 p. m., August 5.

## II

### The Litigation

Commercial set the litigation in motion on September 27, 1971, by a complaint filed against United States Fidelity and Guaranty Company on its Ethridge performance bond dated September 21, 1970. Commercial charged that Ethridge breached its subcontract by (1) failing and refusing to pursue the work in accordance with Commercial's schedule, (2) by failing and refusing to correct deficiences required by its contract, and (3) by failing to furnish test reports on masonry and mortar as required by contract. Commercial demanded damages in the sum of $600,000.

United States Fidelity and Guaranty answered, denied liability, and filed a third party complaint against R. B. Ethridge & Associates, Inc. as well as Robert B. Ethridge and Myrtle B. Ethridge personally, asserting exoneration and third party indemnity.

The third party defendants responded with a cross claim against Commercial Contractors for $287,130.54, alleging that Commercial had breached its contract with Ethridge.

The jury verdict was for United States Fidelity and Guaranty and for Ethridge on the counterclaim. Damages in favor of Ethridge were assessed against Commercial Contractors, Inc. in the sum of $184,940.25.

A motion for a new trial and, in the alternative, for a judgment notwithstanding the verdict, asserted 205 grounds for relief. The motion was denied.

## III

### The Appellate Issues

The 205 grounds asserted below may now be reduced to the following appellate issues: (1) Was the Commercial-Ethridge contract ambiguous?; (2) Was there any waiver or modification of the contract?; (3) Was Ethridge entitled to credit for delays caused by the weather, or by Commercial, or by other subcontractors?; (4) Did Commercial waive the breach by allowing Ethridge to work beyond the cut-off date?; and (5) Was performance impossible?

Our view that there was no ambiguity necessitates reversal for a new trial and the other points will be discussed in the above order.

## IV

### Was the Contract Ambiguous?

Whether the masonry contract between Commercial and Ethridge required performance within a specifically definite period of time, or was ambiguous in that respect, was the focal point of the trial in the District Court. There had been two pretrial orders, neither of which addressed the point. When the trial commenced, however, the District Judge informed the parties of his view that the contract was ambiguous as to the time of performance, and that parol evidence would be admitted concerning the intent of the parties in that regard. The jury was instructed to decide whether the masonry work was to have been performed according to a strict time schedule.

On this point, in our opinion, the trial went legally astray at the outset.

The contract between Commercial and Ethridge, couched in language generally utilized in such instruments, is, of course, in the record. We shall not burden this opinion by lengthy verbatim excerpts. By way of summary, however, the first section of Article I stated that time was of the essence of the contract and that the Subcontractor "agrees to pursue the above work in accordance with Contractor's schedule". Thereafter, it was provided that the Subcontractor would begin work when instructed by the Contractor and would carry it on promptly, efficiently and at a speed that will not

cause delay in the progress of the work. The Contractor was given the option of terminating the contract for default. The Contractor was not to be liable to the Subcontractor for any delay affecting the Subcontractor's work *regardless of the cause* (emphasis added). If the Contractor delayed the work, the Subcontractor was required to make claim for the delay in writing within forty-eight hours of the beginning of the delay. Under Article XII(g), if the Subcontractor breached his agreement the Contractor might terminate the employment of the Subcontractor.

As customary in such matters, the contract further provided that it contained "the entire agreement between the parties, and all additions thereto or changes therein shall be in writing and shall not be binding unless same are in writing".

We are convinced that the only basis for any asserted ambiguity on the question of completion date is founded upon the fact that once the contract was terminated a dispute arose as to what the contract meant in this regard. The September, 1970, work schedule, ratified and adopted by Ethridge when it delivered its executed contract in November, 1970, called for twenty two weeks for the completion of the work. This schedule was not altered by either the December 28, 1970 or the January 29, 1971 updates, about which Ethridge registered no complaint. The March 25, 1971 extension of time for completion on account of inclement weather prior to March 10 held to the twenty two week schedule in that, allowing for time lost to the weather, it was nevertheless clearly specified that the masonry work was to be completed by July 16, 1971. At contract termination on August 5, 1971, Ethridge had been on the job one day short of thirty weeks. Even so, only 60–65% of the work had been done.

■ In Alabama, it is a well settled principle of contract law that the agreement between the parties may consist of several communications or documents, each constituting a link in the chain of promises which comprise the entire contract, *Air Conditioning Engineers v. Small*, 1953, 259 Ala. 171, 65 So.2d 698. Where two writings are connected by internal references to each other or executed simultaneously with respect to the same subject matter and proved to be parts of the entire transaction, they will be found to constitute a single contract, *Moorer v. Tensaw Land & Lumber Company*, 1945, 246 Ala. 223, 20 So.2d 105; *Provident Life & Accident Insurance Company v. Pressley*, 1953, 37 Ala.App. 153, 64 So.2d 618.

■ Where contract terms are free of ambiguity, subsequent conduct by the parties will not be admitted to show what legal effect should be ascribed to the contract language, *Babcock v. Smith*, 1970, 285 Ala. 557, 234 So.2d 573; *Southern Railway Company v. Louisville & Nashville R. Company*, 1941, 241 Ala. 691, 4 So.2d 400; *Twin Tree Lumber Company v. Ensign*, 1915, 193 Ala. 113, 69 So. 525.

■ Ethridge seeks to avoid the 22 week requirement by reference to a schedule mentioned in Article 4.11.1 of the general plans and specifications. That part of the specifications provides:

"The Contractor, immediately after being awarded the Contract, shall prepare and submit for the Architect's approval an estimated progress schedule for the work. The progress schedule shall be related to the entire project to the extent required by the Contract Documents. This schedule shall indicate the dates for the starting and completion of the various stages of construction and shall be revised as required by the conditions of the work, subject to the Architect's approval."

Ethridge asserts that in the absence of the applicability of this provision, the term "Contractor's schedule" in Article I, section 3 has no definite referent, and hence, performance is not bound to a specific time frame but must take place only within a reasonable period of time.

We think Ethridge's position in this regard is wholly untenable. From the outset, his contract was bottomed upon a consistently specified schedule for the completion of the masonry work. Invariably, it called for a specific completion date. As to that date there can be no room for reasonable difference of opinion.

The jury should have been so instructed and the evidence restricted to the other issues discussed *infra.*

## V

### *Waiver, Modifications and Delays*

Ethridge commenced performance on the Bessemer project in mid-January, 1971. As set forth *ante,* work delays were caused by rain, freezing weather, failure of other subcontractors to comply with job sequence, the loss of some employees to the cost-plus contractor, and the termination of the carpentry subcontract.

One of the more crucial issues in this case was whether Ethridge was due any extensions on account of these delays. The relevant provisions of the contract provided:

> Article III(c)—Contractor shall not be liable to the Subcontractor for any delays affecting the Subcontractor's work regardless of the cause therefor.
>
> (d) Should Subcontractor be delayed in his work by Contractor, then Contractor shall owe Subcontractor therefor only an extension of time for completion equal to the delay caused, and then only if a written claim for delay is made to Contractor within forty-eight hours from the time of the beginning of the delay, provided, however, that no delay resulting directly or indirectly from a labor dispute involving the undersigned Subcontractor, other Subcontractor or the Contractor shall be deemed a delay caused by the Contractor and no extension shall be granted on account of such labor dispute.

Balanced against the consideration of whether Ethridge & Associates was due extensions is the question of whether, assuming that extensions were due, Ethridge had prosecuted its performance according to schedule as of the time of termination.[1] In making this assessment it must be remembered that the date of termination was *some 14 working days beyond the July 16 deadline.* Nevertheless, Ethridge had rendered only 60–65% of its total performance when the contract was terminated.

### A. *Weather Delays*

Although the subcontract explicitly provided that Commercial would not be liable to Ethridge & Associates for any delays no matter what the cause, there was evidence that the agreement may have been modified at the preconstruction conference, so as to allow extensions for delays caused by bad weather. The evidence showed that during the preconstruction conference R. B. Ethridge asked Cecil Williams of Commercial if the job schedule would be revised so as to reflect delays attributable to bad weather. According to Ethridge, Williams responded that periodic revisions would be made on this account.[2] The testimony of Mac Saxon, a witness to the conversation between Ethridge and Williams, corroborated Ethridge's version of the exchange.[3] Cecil Williams testified, however, that he had stated that revisions on account of bad weather would be made only if the status of construction got too far out of phase with the schedule.[4]

Correspondence between the parties subsequent to the preconstruction con-

---

1. See Article I, § 3 and Article XII(a) of the contract. Both of these provisions require that subcontractor's work be prosecuted in accordance with the contractor's schedule.

2. Trial transcript, pp. 295–97.

3. Trial transcript, pp. 2201–02, 2238–39.

4. Trial transcript, pp. 2591–92.

ference indicated that the schedule would be updated at least in some respects to show delays caused by bad weather.[5] In addition, on March 25, 1971, Commercial modified the construction schedule so as to reflect time lost to inclement weather up through March 10.[6] The March 25 schedule change extended Ethridge & Associates' time for performance some five weeks over the previous schedule of January 29, 1971.

■ On the basis of the above evidence, the issue of modification was properly submitted to the jury.

■ Commercial argues that if an issue of modification was raised, the jury should have been instructed on the elements of consideration and mutual assent necessary to render the modification binding. The preconstruction conference took place on January 4, 1971, which was prior to any performance on the part of Ethridge. At that point the contract was still executory. The rule in Alabama is that no consideration is necessary for the modification of an executory contract; all that is required is the parties' mutual assent, *Young v. United States, for Use of Brown,* 5 Cir., 1964, 327 F.2d 933; *Allied Mills, Inc. v. St. John,* 1963, 275 Ala. 69, 152 So.2d 133; *Moore v. Williamson,* 1925, 213 Ala. 274, 104 So. 645. Further, a written executory contract may be modified by a subsequent oral agreement, despite a provision in the contract that all modifications be in writing, *Cowin v. Salmon,* 1943, 244 Ala. 285, 13 So.2d 190; *Long v. Shepherd,* 1909, 159 Ala. 595, 48 So. 675;

*Tilley v. Bartow,* 1913, 8 Ala.App. 639, 62 So. 330; 6 Corbin, Contracts § 1295 (1962).

■ No instruction on consideration was required. However, Commercial would be entitled to an instruction on mutual assent with respect to this alleged modification.[7] *See McClendon v. Reynolds Electrical and Engineering Company,* 5 Cir., 1970, 432 F.2d 320, 323–24; *Atlantic Coast Line R. Co. v. Dixon,* 5 Cir., 1951, 189 F.2d 525, 528.

Although a jury issue was raised as to whether the contract was modified at the preconstruction conference, the March 25, 1971 change in completion deadlines was a modification of the contract, and the jury should be so instructed.

[11] The March 25 schedule revision has further significance. According to the March 25 modification, the completion deadline was extended to reflect delays attributable to weather from the date of commencement up through March 10. An extension of some 25 working days was allowed in this respect, and no objection was lodged by Ethridge as to the propriety of this amount of time. Under these facts, then, Ethridge would be precluded from claiming any additional time for delays attributable to bad weather prior to March 10.

### B. *Delays Allegedly Caused by Commercial and Other Subcontractors*

Ethridge claimed that delays caused by Commercial and other subcontractors

---

**5.** Defendant's exhibit No. 4, Letter from Fred Lipscomb to Cecil Williams, dated January 5, 1971; Defendant's exhibit No. 7, Letter from Mac Saxon to Fred Lipscomb, dated March 31, 1971; Testimony of Mac Saxon with reference to his March 31, 1971 letter to Fred Lipscomb, trial transcript, pp. 2238–39; Defendant's exhibit No. 36, Letter from C. C. McDuff to Fred Lipscomb, dated April 26, 1971.

**6.** Defendant's exhibit No. 30, Letter from Mac Saxon to R. B. Ethridge & Associates, dated March 25, 1971; Defendant's exhibit No. 80,

"Bessemer Turnkey Construction Schedule, revised March 10, 1971".

**7.** In its charge to the jury, the District Court included an instruction on mutual assent with reference to the original written contract between Commercial and Ethridge & Associates. Trial transcript, p. 3504. However, mutual assent with respect to that contract is no longer an issue in the case, but it remains an issue on the question of modification. Therefore, on remand, the Court's charge on mutual assent should be directed solely to modification.

prevented performance in accordance with the contract schedule. Although there was evidence by which the jury could have determined that Ethridge was so delayed, the threshold question was whether or not, under the contract, there was a legal basis for allowing credit for these delays. The relevant contract provision is Article III(d):

> Should Subcontractor be delayed in his work by Contractor, then Contractor shall owe Subcontractor therefor only an extension of time for completion equal to the delay caused, and then only· if a written claim for delay is made to Contractor within forty-eight hours from the time of the beginning of delay, provided, however, that no delay resulting directly or indirectly from a labor dispute involving the undersigned Subcontractor, other Subcontractor or the Contractor shall be deemed a delay caused by the Contractor and no extension shall be granted on account of such labor dispute.

Much of this dispute turned on whether Commercial waived the requirement that notice of delays be submitted to the general contractor within 48 hours after the commencement of delay.

R. B. Ethridge testified that Mr. McDuff told him that Commercial would keep a tabulation of weather and subcontractor delays and that it would be unnecessary to give written notice every day; that on oral notice McDuff had, in fact, given time credit.

█ If McDuff was acting within his authority, this was sufficient to raise a jury issue as to waiver of written notice.

In addition to being allowed extensions for delays caused by Commercial, as provided in Article III(d), Ethridge claimed that it was also promised extensions for delays caused by other subcontractors. The basis for this claim is the testimony of R. B. Ethridge that C. C. McDuff of Commercial represented to him on several occasions that Ethridge would be credited with delays caused by other subcontractors.[8] The only documentary evidence of such a representation, however, was a written notice which Ethridge received from Commercial on February 25, 1971. It provided:

CREDIT

Bessemer Turnkey Housing
February 25, 1971

SUBCONTRACTOR: R. B. Ethridge & Associates, Inc.

CREDIT FOR: Two days in footing. Donahoo does not have structural pads ready.

Defendant's exhibit No. 6.

At a later date, Ethridge submitted two notices of delays caused by other subcontractors,[9] but there is no evidence as to what action was taken by Commercial on these documents.

█ Thus the District Court did not err in submitting to the jury the question of whether or not the contract was modified so as to allow Ethridge credit for delays caused by other subcontractors. However, the matter does not end here. The modification which Ethridge claims whth respect to extensions for delays caused by other subcontractors is one which took place, if at all, after performance was commenced.

Such a modification, taking place while a contract is executory and before a breach or a threat of breach,[10] does not require consideration to be binding. *See*

---

8. Trial transcript, pp. 398–402.

9. Defendant's exhibits, Nos. 33 & 34.

10. The recent Alabama case of *Mobile Turnkey Housing, Inc. (Commercial Contractors, Inc.)* v. *Ceafco, Inc.*, 1975, 294 Ala. 707, 321 So.2d 186, is distinguishable from this case. In *Mobile Turnkey*, it is clear that the contracting party was in breach of its contract at the time the modification was agreed to.

*Young v. United States, for Use of Brown,* 5 Cir., 1964, 327 F.2d 933, 935–36; *Moore v. Williamson,* 1925, 213 Ala. 274, 104 So. 645, 649; *Pioneer Savings & Loan Company v. Nonnemacher,* 1900, 127 Ala. 521, 30 So. 79, 88.

## VI

### Waiver of Breach

■ In the event that Ethridge was not entitled to any extensions, the question arose as to whether by accepting performance beyond the July 16 deadline Commercial waived its right to terminate for failure to comply with the contract schedule. The rule in Alabama is that where a contract provides that time is of the essence, the party in whose favor the provision runs must make an election when the time for performance by the other party arrives. He may either terminate the contract and hold the other party in breach, or waive the time requirement and accept performance within a reasonable period of time.

"Where the party to whom delivery has not been made within the time stipulated does not treat the contract as breached, but evidences to the other party thereto, a purpose to continue it in force, or to reserve to himself the right to insist on its further performance at some future time, he waives the time limit, and for a reasonable time thereafter the respective parties are bound by the terms of the contract. . . .

"One cannot claim the benefits of a contract and insist upon its further performance, and at the same time ask its dissolution. When a breach occurs, an election must be made between treating the contract as dissolved in toto, and insisting upon further performance. The choice is made once for all. . . . Even when time is expressly declared to be of the essence of the contract, it may be waived by the conduct of the party for whose benefit the stipulation is made; as, for instance, where he recognizes the con-

tract as still in force after the time for performance has passed."

*Lowy v. Rosengrant,* 1916, 196 Ala. 337, 71 So. 439, 442 (citations omitted); *See also Thompson v. Thompson,* 1952, 257 Ala. 10, 57 So.2d 393; *McAnelly Hardware Company v. Bemis Brothers Bag Company,* 1922, 208 Ala. 394, 94 So. 567.

■ The jury was instructed that if Commercial accepted performance from Ethridge past the contract deadline, such conduct would constitute a waiver of the strict time stipulation, and the time for performance would then be altered to a reasonable period of time. This instruction accurately reflected the controlling legal principles.

However, consideration of waiver of the breach would be confined to only those instances where the jury found that Ethridge was entitled to no extensions at all or where it found the total number of days allowable for extensions was less than fourteen. Otherwise, the schedule deadline would be moved beyond the August 5 date of termination by virtue of the extensions. On remand the jury should be instructed accordingly, and its consideration of waiver of the breach should be carefully delineated.

## VII

### Impossibility of Performance

A major thrust of Ethridge's counterclaim was that it was excused from failure to perform on account of acts by Commercial which hindered or prevented its performance. Primary reliance was placed on the fact that Ethridge lost at least eight, and perhaps more, of its brick masons to Tillery Masonry Corporation, who was retained by Commercial to complete the ten buildings relinquished by Ethridge in Change Order No. 1. Ethridge claimed that, because Commercial had allowed Tillery to hire away some of Ethridge's men, Commercial had improperly hindered or prevented Ethridge's performance. Therefore, Ethridge claimed that its performance was excused.

■ Without deciding it at this juncture we have grave doubts of the validity of this claim. While there is an implied condition of cooperation and good faith between contracting parties, we have found no cases which hold that a general contractor promises a subcontractor by implication that he will not lose men to other subcontractors on a construction job even if the other subcontractor may be paying a higher wage.

■ We lean to the view that under the evidence developed impossibility of performance should not have been submitted as a defense in this case. Ethridge assumed the risk of providing labor, and that included the risk of whether he could be competitive with other subcontractors in an overcrowded building market.

Unless in the construction industry there is a well known custom to the contrary, we do not see how Commercial could be held to a guarantee that Ethridge's work force would not be affected by competing subcontractors, even on the same job.

The other appellate issues raised by the parties have been considered and found to be without merit.

### VIII

*Some Caveats for Future Reference*

■ Although Ethridge asserted that certain provisions of the contract were either waived or modified so as to permit it extensions for delays caused by the general contractor, other subcontractors, or bad weather, there was no evidence that the basic provision calling for ultimate performance according to the contractor's · schedule was ever waived or modified. Thus, the effect of a finding that Ethridge was entitled to extensions would be merely to adjust the completion deadline by the amount equivalent to the time allowable for such extensions. A grant of extensions would not relieve Ethridge of the responsibility to complete its work in accordance with the original deadline, plus the time due for extensions.

■ If a jury should find that provisions of the contract were waived or modified so as to allow extensions for various delays, the next question, assuming that extensions were allowed, would be whether Commercial's termination was wrongful. Article XII(a) of the contract gave Commercial the right to terminate whenever the subcontractor failed to *prosecute* its work according to schedule. We construe the term "prosecute" to mean render timely performance throughout the entire period allotted for performance. Hence, Commercial could invoke the right to terminate at any time that the subcontractor failed to substantially perform according to schedule. The contract did not require Commercial to await the time for full performance before it could exercise the power of termination. Even though Ethridge may have been granted extensions due to various causes, it could nevertheless be found in breach if a determination were made that, notwithstanding extensions, *substantial performance would not have been delivered by the date of the new schedule deadline.*

Assuming that extensions were granted, the crucial question would be: Would Ethridge have performed the remaining 35–40% of its work during the time period created by extensions? If not, then termination by Commercial would have been justified, and it would be entitled to its damages as provided by the contract.

On the other hand, if it were found that Ethridge would have performed the remainder of its work during the allowable extension period, then termination by Commercial would be wrongful and Ethridge would be entitled to prevail.

Because the concept of a schedule involves a certain amount of mathematical precision, the instructions to the jury in this case on the question of extensions should carry a degree of mathematical certainty.

 Under the Court's prior instructions, the jury was to separately consider each claim by Ethridge that a provision of the contract was either waived or modified to allow extensions for a particular cause. Having made that determination with respect to each separate ground alleged as a cause for extensions, the jury was then to consider whether Ethridge's failure to perform according to schedule was excused for that particular cause. Conceivably, under such a scheme of instructions the jury could find that if the extension allotted to any one cause would move the schedule deadline past the date of termination, then Ethridge would be excused from failure to perform, and would be entitled to recover. This, obviously, is not enough.

On the subject of extensions, the jury should first consider the following points, in the order given:

(1) Was the contract modified so as to allow Ethridge extensions for the working days lost to *bad weather*? If so, what was the number of days after March 10 to which Ethridge was entitled on this account?

(2) Was the contract modified so as to allow Ethridge extensions for the days lost to delays caused by other subcontractors? If so, to how many days of extension is Ethridge entitled on this account?

(3) Was there a waiver of the provision in the contract which required Ethridge to give Commercial written notice of delays caused by Commercial within 48 hours after the commencement of such delay? If so, to how many days of extension is Ethridge entitled for delays caused by Commercial?

Next, the jury should calculate the total number of days, if any, allowed for all extensions. From this number, it should deduct the number "14", representing the excess days that Ethridge was on the job after July 16, 1971. The remainder from this last calculation would represent the net amount of days allowed for extensions. Equipped with this figure, the jury should then calculate whether or not Ethridge would have performed the remaining 35–40% of its work within the time period represented by the net extension due.

The judgment of the District Court is reversed and the cause remanded for further proceedings not inconsistent herewith.

Reversed and remanded.

JOHN R. BROWN, Chief Judge (concurring):

I concur fully in the excellent opinion of Judge Coleman written for the Court. I only suggest that upon remand the complex factual issues concerning performance extensions which are discussed in Part VIII of the majority opinion,[1] could be resolved most expeditiously if the trial Court utilized the marvelous tool of a general charge with special interrogatories under the provisions of F.R.Civ.P. 49(a).[2] *See generally,* Brown, *Federal Special Verdicts: The Doubt Eliminator,* 1968, 44 F.R.D. 338; Joiner, *Jury Trials—Improved Procedures,* 1970, 48 F.R.D. 79, 86; Wright, *The Use Of Special Verdicts In Federal Court,* 1965, 38 F.R.D. 199; See also *Modern Federal Practice Digest,* Fed.Civ.Proc. 2231–41.

Had this procedure been utilized at the initial trial of the case at hand, it is quite likely that much of the retrial would have been unnecessary; for this Court, on appeal, would have been able

---

1. See pp. 955–956.

2. Too much emphasis cannot be placed on the fact that I am speaking solely about 49(a) and not 49(b) which is a trap for the unwary lawyer or trial or appellate Judge. The distinction between the two is that 49(a) melds the general jury *charge* with the juries' answers to special interrogatories which are controlling. 49(b) on the other hand launches both counsel and the trial Judge on a treacherous tightrope walk caused by the fact that under 49(b) the general *verdict* (not charge) and the special answers must not conflict, for if they do, both are extinguished. For further discussion of this distinction see Brown, *Federal Special Verdicts: The Doubt Eliminator, supra* at 339–40.

to ferret out those issues which were unsubstantiated by the verdict or were not jury issues as a matter of law.[3]

---

3. *See Horne v. Georgia Southern and Florida Railway Co.,* 5 Cir., 1970, 421 F.2d 975, 980 (Brown, C. J., concurring) where we were able to affirm the holding of the trial Court and avoid retrial because the use of 49(a) special interrogatories allowed us to conclude that the erroneous decision of one issue was harmless error. Only because of the special interrogatories, one of which categorically found that the railroad company defendant had been guilty of willful and wanton negligence which proximately caused the injury to the plaintiff, were we able to demonstrate the harmlessness of a jury finding of intervening cause. For other cases demonstrating the utility of 49(a) in avoiding confusion in complex cases see e. g., *Little v. Bankers Life & Casualty Co.,* 5 Cir., 1970, 426 F.2d 509, 512 (Brown, C. J., concurring); *American Oil Co. v. Hart,* 5 Cir., 1966, 356 F.2d 657, 659. *See also Griffin v. Matherne,* 5 Cir., 1973, 471 F.2d 911 (where the use of 49(a) by the trial Court allowed us to affirm the judgment as to one defendant while reversing the judgment as to two others and thus we were able to avoid the unnecessary relitigation of issues which were correctly decided at the initial trial of the case).